Jeff Prostok
State Bar No. 16352500
Suzanne K. Rosen
State Bar No. 00798518
**FORSHEY & PROSTOK, LLP**
777 Main Street, Suite 1550
Fort Worth, TX 76012
Tel: 817-877-8855
Fax: 817-877-4151
Email: jprostok@forsheyprostok.com
        srosen@forsheyprostok.com

*Proposed Counsel for the Debtor*
*Eventide Credit Acquisitions, LLC*

Robin Phelan
State Bar No. 15903000
**PHELANLAW**
4214 Woodfin Drive
Dallas, Texas  75220
Tel:  214-704-0222
Email:  robin@phelanlaw.org

*Proposed Special Counsel for the Debtor*
*Eventide Credit Acquisitions, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| EVENTIDE CREDIT ACQUISITIONS, LLC, | § | Case No. 23-90007-mxm-11 |
| | § | |
| Debtor. | § | |
| | § | |

**POSITION STATEMENT BY THE DEBTOR REGARDING**
**BANKRUPTCY CASE FILING AND RELATED ISSUES**

Eventide Credit Acquisitions, LLC ("**Eventide**" or the "**Debtor**"), as debtor and debtor-in-possession, files this statement in support of pleadings to be filed in this Chapter 11 case and states:

**PRELIMINARY STATEMENT**

1.      The affairs of this Debtor, and resolutions of its issues, require an understanding of the history of Eventide and its relationships with other entities.  It will be more efficient and save time for this Court and parties in interest to set the stage up front.  So, although this statement is somewhat lengthy, reading it will be time and cost effective for this Court and parties in interest. Many of the facts and issues discussed are in summary form with full development to occur through later pleadings.

2.      Martorello is the founder and manager of the Debtor.  He is also formerly the founder and manager of Bellicose Capital, LLC. ("**Bellicose**").

3.      Bellicose was a technology and database company.  A Bellicose subsidiary,

SourcePoint VI ("**SPVI**"), provided data driven advisory services to multiple online consumer lending clients.

4.      In 2011, Martorello became aware of an opportunity for Bellicose to service a federally recognized Indian tribe, the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("**LVD**" or the "**Tribe**"), which had been exploring online lending as a means of generating much needed revenues for the Tribe.[1]

5.      On July 8, 2011 the LVD Tribal Council passed resolutions to) enact their first lending code (the "**Code**") for online lending.

6.      LVD began its online lending business with a tribal entity called Sovereign Lending Solutions, LLC.

7.      In September 2011, LVD formed Red Rock Tribal Lending, LLC ("**RRTL**") a wholly owned arm of Tribe, with all of its operations on the reservation, and in compliance with all Federal laws.

8.      Bellicose could provide valuable data and other services to LVD.  Prior to doing so, however, Martorello engaged Jennifer Weddle, of Greenberg Traurig ("**GT**"), one of the most prominent Indian law lawyers in the country, to structure the transactions to ensure that both the tribal loans and the relationships between his companies and LVD were entirely lawful.  After examining the appliable law and investigating all aspects of the LVD lending business, GT structured the transaction based on its determination that the arrangement between Bellicose and LVD would be perfectly legal.

9.      A servicing agreement between RRTL and SPVI (the "**Servicing Agreement**") was created by GT and Rosette LLP (the Tribe's lawyers), modeled after the National Indian Gaming Commission ("**NIGC**") management template.  Under the Servicing Agreement, in payment for the data management and other services provided by SPVI, RRTL would first issue

---

[1] The video accessible through the following link reflects the conditions and remoteness of the LVD reservation: https://vimeo.com/91351636.

the Tribe a guaranteed monthly dividend, then it would pay all of RRTL's expenses, and if anything was left, SPVI would be paid a performance-based fee based on the net profitability of RRTL. Under the Servicing Agreement, RRTL could fire SPVI with 180 days' notice.

10.    Dozens of legal opinion letters and written statements by both GT and lawyers for LVD concluded that state law does not apply to tribal loans.    RRTL and SPVI executed and implemented the Servicing Agreement.

11.    Between 2012 and 2014, LVD and Martorello discussed the potential sale of SPVI to the Tribe.    Ultimately, Martorello retained John Williams, an adjunct professor of Indian law and Indian law attorney to facilitate the sale.    Eventide was formed and acquired ownership of Bellicose, which received the assets relating to SPVI.    Eventide then sold Bellicose to the Tribe on January 26, 2016, in a seller-financed transaction.[2]

12.    In connection with the 2016 sale, LVD created Big Picture Loans, LLC ("**BPL**") as the tribal lending entity, Ascension Technologies, LLC ("**Ascension**"), as the servicing entity, and a holding company Tribal Economic Development, LLC ("**TED**") to hold the ownership of BPL and Ascension.

13.    In exchange for conveying the Bellicose equity to the Tribe, Eventide received a variable payment note that terminated at the end of seven years or payments totaling $300 million (the "**Original Note**").[3]    Bellicose was worth at least $100 million, and possibly much more.

14.    The Tribe's counsel, Rosette, LLP, provided the Debtor with a legal opinion regarding the enforceability and legality of the transaction.

15.    In February of 2016, LVD began lending as Big Picture.    Ascension obtained the

---

[2] As a result of a public press release where LVD's Chairman and Martorello announced this sale transaction, an onslaught of litigation against them would begin in June of 2017:  https://www.prnewswire.com/news-releases/lac-vieux-desert-band-of-lake-superior-chippewa-indians-bolsters-tribal-economic-development-portfolio-with-purchase-of-bellicose-capital-llc-300210679.html.

[3] This seller financed model was designed by the Rosette law firm and used by several other tribal lending enterprises both before and after Eventide's seller-financed transaction with LVD.  Eventide engaged Mr. Williams and Conner and Winters because he and his firm were specialists and had already represented the seller in one such identical transaction with Rosette law on the other side.

old assets of Bellicose/SPVI and serviced the loans.  Since the 2016 sale, Martorello has had no involvement in LVD's lending operation.

16.      In August of 2020, as part of a settlement of disputes between the Debtor and the Tribe, the Original Note was replaced by a new note (the "**New Note**") which eliminated the variable payment structure, and a revised Loan and Security Agreement ("**LSA**").  Instead, the New Note provided *fixed payment amounts* and more simplified terms.  The New Note is secured by all the assets of BPL.  Rosette provided another similar legal opinion.

17.      On September 1, 2023, LVD failed to make payment under the New Note, the debt is now accelerated and demand to enforce the loan agreement has been made by the Debtor for approximately $26,850,000.  The Debtor will seek enforcement of its rights under the New Note and LSA for the benefit of its legitimate creditors.

## THE LITIGATION

18.      The relationship between LVD, SPVI and the Debtor resulted in several lawsuits in courts from Oregon to Virginia to Massachusetts and an aborted Chapter 11 of Eventide.  The prior Chapter 11 of Eventide, in this court, was dismissed, principally on the grounds that Eventide, at that time, had adequate resources to defend itself against the lawsuits with overlapping plaintiffs and counsel.  After millions of dollars in legal expenses, Eventide is no longer capable of defending itself in multiple suits nor obtaining payment from the Tribe, without the benefit and protection of Chapter 11.

19.      The first case filed relating to LVD's lending operations, the *Williams* litigation, was filed in June of 2017 in the Eastern District of Virginia.  The *Williams* suit is a statewide class action originally brought against BPL, the tribal council members, and Martorello for alleged violation of the Virginia usury laws, unjust enrichment, and "collection of unlawful debt" under the Racketeering and Corrupt Organizations Act ("**RICO**").  The Debtor *is not* a defendant in the *Williams* suit and only consumer borrowers residing in Virginia are at issue.

20.      After an adverse ruling in the Virginia district court (which had ruled that BPL and

Ascension were *not* arms of the Tribe), LVD appealed to the Fourth Circuit.  On the same facts, the Fourth Circuit overturned the lower court's ruling, which resulted in dismissal of BPL and Ascension from *Williams* as bona fide arms of a sovereign tribal nation.[4]

21.     That left Martorello as the sole defendant in the *Williams* case without any ability to compel tribal witnesses, due to their tribal immunity.[5]  Martorello is indemnified by the Debtor, as are other related defendants in multiple suits alleging usury violations, for actions taken on behalf of the Debtor.  The *Williams* litigation recently resulted in a $43 million summary judgment ruling against Martorello, effectively holding that anyone who deals with tribal lending, potentially including the Debtor, is guilty of violating RICO and that advice of counsel/good faith are not defenses.  Martorello and the Debtor completely disagree and Martorello will appeal the *Williams* ruling.

22.     None of the district court's rulings in the *Williams* case, many of which are contradictory to the 2019 Fourth Circuit ruling in *Williams I*, are binding on this Court.

23.     Two new copycat suits were filed in June and July 2023in Indiana and Illinois, each

---

[4] *Williams v. Big Picture Loans, LLC,* 929 F.3d 170, 185 (4th Cir. 2019) ("***Williams I***").  In overturning its nearly all of its legal conclusions, the Fourth Circuit's written opinion observed that the lower court had: "discounted facts and instead speculated" regarding control of BPL; hypothesized "without pointing to any evidence and casting doubt on [witnesses'] assertions" regarding whether BPL's revenue in fact funds the essential government services identified by the Tribe; concluded one of the legal factors against the Tribe despite the Plaintiffs having conceded it; cited to cases that did not support the court's proposition that the Tribe did not significantly depend on BPL's revenue and overburdened the Tribe's evidentiary standard to prove its reliance on BPL's revenue; faulted the Tribe for not doing more to increase tribal employment while also noting there was no evidence they had the capacity to train its members for such skilled positions; and noted the evidence did not support the district court's conclusion with regard to the purpose for the creation of BPL and Ascension.  The Fourth Circuit noted that their tribal status and immunity "does not depend on a court's evaluation of the respectability of the business in which a tribe has chosen to engage."

[5] Once the district court in the *Williams* matter proceeded against only Martorello, it next conducted an interlocutory pre-merits discovery phase misrepresentation hearing, whereby each side was allotted four hours to present evidence addressing 17 specific supposed misrepresentations.  The district court then found that certain of the Tribe's motion to dismiss facts previously relied on by the district court and the Fourth Circuit in making the determination that Big Picture and Ascension were arms of the LVD tribe were based on misrepresentations.  *In re Williams v. Big Picture Loans, LLC,* Civil Action Nos. 17-0461, 2020 U.S. Dist. LEXIS 216792, 2020 WL 6784352 (E.D. Va. Nov. 18, 2020) (the "Subsequent *Williams* Ruling"), *aff'd* 59 F.4th 68 (4th Cir. 2023) ("***Williams II***").  The Subsequent *Williams* Ruling does not alter the Fourth Circuit's determination in *Williams I* that Big Picture and Ascension are arms of the LVD tribe applying the multifactor *Breakthrough* test.  *Williams I*, 929 F.3d at 177 (*citing Breakthrough Mgmt. Group, Inc. v. Chukchansi Gold Casino & Resort,* 629 F.3d 1173 (10th Cir. 2010)).  Specifically, the Subsequent *Williams* Ruling only <u>affects one-third of one element</u> (the "control" element) of the *Breakthrough* test, which the Fourth Circuit had already decided did not weigh in favor Ascension in any event (but nonetheless was still held an arm of the Tribe).  *Id.* at 183-84.

seeking to represent a statewide class. However, the cases were dismissed on the Petition Date with prejudice as to the named plaintiffs and *without prejudice* as to the claims of the putative classes. The Debtor does not know the reason for the dismissal. Regardless, continuing to defend itself in multiple legal forums (Virginia, Oregon, and Massachusetts – and possibly Indiana, and Illinois) will quickly deplete the Debtor's limited resources and the Debtor will be unable to finance its attempt to collect on the New Note for the benefit of its legitimate creditors.

24.    Given the urgency of the litigation against BPL, and the number and magnitude of the outstanding claims against the Debtor, this bankruptcy case is needed to centralize the disputes against the Debtor in order to avoid the type of race to the courthouse that bankruptcy was designed to protect against. As a result, the Debtor's principal objectives in this bankruptcy case are to (i) collect the amounts owed to the Debtor by LVD, and (ii) to resolve the alleged usury, RICO, and indemnity claims against the Debtor in a single forum. Importantly, the Bankruptcy Court is the ***only*** forum where LVD and the related tribal entities are not shielded by sovereign immunity such that *all* parties will be permitted discovery and may resolve their disputes in the same forum.[6] The Debtor's objectives are conceptually straightforward; however, they are interwoven, and resolution of the issues may involve a degree of complexity.

### THE TRIBE

25.    The claim against BPL is a defined claim. BPL defaulted under the New Note by failing to make payment due on September 1, 2023. On August 3, 2023, BPL had informed the Debtor that it is terminating the New Note effective November 1, 2023 (or whenever the ruling in *Williams* gets issued – neither of which have yet occurred), because the *Williams* ruling against Martorello purportedly resulted in a *force majeure*, thereby allowing LVD to terminate the New Note and *keep* the underlying company that it purchased and continues to operate without having

---

[6] *See Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 143 S. Ct. 1689, 1698-99 (2023) ("The Code unequivocally abrogates the sovereign immunity of all governments, categorically. ***Tribes are indisputably governments. Therefore, §106(a) unmistakably abrogates their sovereign immunity too.***").

to pay for it.

26.     Although this dispute was submitted to arbitration shortly before the filing of the

Debtor's bankruptcy case, the panel is not yet fully assembled.  In addition to the importance of

the New Note to the Debtor's bankruptcy estate, resolution through arbitration will be too lengthy

and expensive.  Collections on the New Note are the only current source of cash flow of the

Debtor, and without payments the Debtor will not be able to meet its obligations or fund this

Chapter 11.[7]

## THE USURY CLAIMS

27.     Notwithstanding the recent ruling in *Williams* against Martorello, the Debtor is

convinced that the plaintiffs in the class action cases currently pending against the Debtor (the

"**Plaintiffs**") do not have allowable claims.  The alleged claims arise from suits against the Debtor

and a number of other Debtor indemnified defendants (the "**Defendants**") alleging violations of

state usury laws.  The theories of the Plaintiffs ignore two fundamental premises.  First, state

usury laws apply to lenders.  The Debtor and the other Defendants are not lenders.  RRTL and

BPL are the lenders.  Second, to the extent that state law governs a transaction, state usury laws

only apply to lenders making loans in the relevant state.  The tribal lenders never left the

reservation.  For whatever conduct occurs on the LVD reservation, state law undisputedly does

not apply.  That a reservation-based business may use the telephone, fax machines, the US mail

or Federal reserve ACH systems, email, websites, local advertising, cloud servers, and offshore

call centers is entirely irrelevant, *unless* Congress takes away those tools of commerce from tribal

economic development.  Well-established federal law and policy is to protect and promote those

available tools and defer to the wisdom and plenary power of Congress.

28.     RRTL and BPL's loans are consummated (and all non-ministerial elements occur)

---

[7] Unlike in the 2020 bankruptcy, where the Debtor was able to obtain secured financing, with a new ruling in *Williams* concluding that any party associated with the tribe's lending operation will be held liable for treble damages under RICO's collection of an unlawful debt, without regard to their good faith intentions, there are obviously no financing alternatives available to this Debtor.

on the reservation, where all such activity is regulated by the Tribe and the federal government, i.e., the Consumer Financial Protection Bureau (the "**CFPB**"), *not* the states. The "who, where and what" of the Indian Commerce Clause decides the issue.[8] And where a state usury law seeks to regulate *a lender* (*who*), with regards to the terms and conditions under which it may make its loans (*what*), which are determined and consummated on a tribal reservation (*where*), such state law does not escape the federal preemptive power of the Indian Commerce Clause and the joint federal policy and tribal interests in tribal self-governance, tribal economic development, and tribal self-sufficiency. Such policies and interests include preventing the states from indirectly infringing on tribal sovereignty by effectively cutting off its off-reservation suppliers who will be afraid of violating RICO.

29.     Put simply, only Federal (and tribal) laws apply to any on-reservation business activities of Indian Tribes. Congress has not taken away the internet from tribal contracting, nor have they taken away any of the other modern tools of commerce that Tribes today are taking advantage of to further their self-sufficiency.

30.     Implementation of these simple concepts are more abstract and complex,[9] and the Supreme Court of the United States has issued many opinions dealing with the outer boundaries of tribal and state regulations. Simply put, Congress has not permitted state usury laws to infringe on the lending operations of the tribes, including LVD. Nor has it permitted the courts to second-guess the business judgments of tribes with respect to hiring non-Indian expert managers, or buying a non-Indian business, and what economic terms a sovereign government might agree to (as Congress *has* done in gaming). As described below, Congress did just the opposite. And ever since, *this* Tribe has been registered with and co-regulating consumer complaints alongside the CFPB *for nearly ten years.*

---

[8] U.S. Const., Art. I, § 8, cl. 3.

[9] To whatever Plaintiffs posit as being improper with RRTL and BPL, the question is simply "where did Congress take tribe's ability to do that away" and the answer is always, "they have not."

31.    The time has come to collectively resolve these disputes and determine that the Plaintiffs do not have allowable claims.

32.    Other than *Williams,* the Plaintiffs' theories have never been applied by courts to arm-of-the-tribe lending operations like those in this Chapter 11 case and have never been applied to a legitimate vendor to, or creditor of, an Indian tribe.  An adverse ruling by the Court in this case involving multiple overlapping plaintiffs in multiple state classes will be novel, and it will negatively impact the ability of Indian tribes to use the internet and the ordinary tools of commerce without any act of Congress having diminished tribal sovereignty.[10] The immediate impact of a negative ruling by this Court will likely be to impair or terminate the alleged illegal lending business of LVD where LVD's rates exceed state usury caps, which will negatively impact the tribe, the Debtor, its creditors, and, strangely, certain of the Plaintiffs who now hold a $43 million summary judgment ruling against the Debtor's founder and Manager and (incredibly) seek to take the New Note for themselves.[11]

33.    Even if everything alleged by the Plaintiffs regarding Martorello's involvement in LVD's lending operation is correct, the result is exactly what Federal law dictates.  The efforts by the Plaintiffs to manufacture RICO claims under a pejorative "rent-a-tribe" theory have no legal basis, are an affront to routine tribal nation building efforts in numerous industries, impermissibly conflict with well-established federal law and federal interests, and are precisely the type of efforts federal law obligates the United States government to guard against.

34.    The loan agreements between the LVD tribal entities and the Plaintiffs are not

---

[10] For example, under Plaintiff's theories, an Indian sovereign nation cannot issue insurance policies online from a remote reservation and acquire resources not available on its reservation: i.e., non-Indian actuaries, executives, cloud-based servers, urban call centers, and other parties to assist in the running of such insurance business unless they submit to state regulatory authority.  Tribes will be restricted to their reservation-based resources and refrained from enlisting necessary support to do more than engage in crafts for the few folks compelled to come travel to their remote reservation.  Restrictions to tribal sovereignty and economic development are for Congress.

[11] As discussed *infra*, LVD and certain Plaintiffs previously entered into a settlement agreement where part of the cash flow from LVD's allegedly illegal lending business is paid to those Plaintiffs.  Stranger still, that settlement transferred to those Plaintiffs a minority interest in the Debtor.

alleged to have violated any federal or tribal law. The lenders have complied for nearly 11 years now with all federal consumer lending laws, without issue. They also contain all appropriate disclosures of rates and terms and acknowledge and consent to the tribal lender's sovereignty and the applicability of tribal law to the contracts. The lender operates and is firmly rooted exclusively on the reservation where it is not disputed that state usury laws do not apply. What the Plaintiff's fail to understand is that the legal incidence and impact of the state usury law falls on the tribal government lender, *not the borrower*, and is therefore not applicable to BPL or RRTL.[12] State usury laws are not seeking to regulate borrowers (i.e. its own citizens) or prohibit their possession of such loans – as they could – but rather seek to regulate the tribal lender. Moreover, the off-reservation supporting components of BPL and RRTL are sanctioned by Congress, not a means for an end-around to diminishing tribal sovereignty. The location of the borrower, or even the loan transaction, simply is not relevant.

### THE ACTIONS OF THE DEBTOR AND THE DEFENDANTS PROMOTE AND COMPLY WITH FEDERAL LAW AND POLICY

35. The Supreme Court has recognized that a key goal of the Federal Government is to render Tribes more self-sufficient and better positioned to fund their own sovereign functions, rather than relying on federal funding, and that tribal business operations are critical to the goals of tribal self-sufficiency.[13]

36. Non-Indians are encouraged by Federal law and policy to approach tribes with ideas. Tribes are encouraged to attract outside investment and use outside experts to run their businesses and provide the capital to establish their tribal operations. The tribes are encouraged

---

[12] *Oklahoma Tax Commission v Chickasaw Nation*, 515 U.S. 450 (1995). After rejecting the State's request to perform a balancing test pertaining to taxation of fuel sales made on the reservation to non-Indians, opting instead for a more categorical and dispositive approach absent clear congressional authorization (legal incidence test), (like here) the state next argued that the legal incidence would ultimately fall upon the wholesaler or the consumer. The court rejected that and decided in favor of the tribe. A similar incidence test is appropriate here, given the more recent Native American Business Development Act of 2000 and further developed modern federal policy since *Chickasaw*. Particularly considering the federal government's longstanding approach to preemption of state usury laws in banking, even when third party payday lending originators seek to party with banks with the express intent to use their licenses to export interest rates, as the FDIC has thoroughly discussed.

[13] *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 810 (2014) (Sotomayor, J., concurring).

to self-determine the economics of these arrangements based on their knowledge of what is best for their tribe.

37.     Statutes designed for the benefit of the tribes are subject to the longstanding canon of construction that they must be liberally construed in favor of Indian tribes. Conversely, statutes which abrogate tribal rights are to be construed narrowly and most favorably toward tribal interests.[14]  Federal law says tribes and non-Indians *should* develop Indian nation building ventures to alleviate Indian issues of remoteness, poverty, the costs and burdens of self-government, and extreme lack of resources.[15]

38.     Tribal sovereignty *predates* the Constitution, and tribes have treaties with the United States of America, not the states. Federal Indian law dictates that tribes are sovereign nations, with a *pre-existing* sovereignty that can only be restricted by Congress.[16]  Tribes are subject to federal law and authorities so tribal lending entities are subject to and may be held accountable for certain regulations of federal agencies such as the federal lending laws enforced CFPB, the Federal Trade Commission and the Department of Justice. States may not limit, restrict or otherwise impose (directly or indirectly) on tribal sovereignty without Congressional authorization. In implementing Federal law, a federal agency should defer to tribal law and decisions. With respect to Federal statutes and regulations administered by Indian tribal governments, the Federal Government shall grant Indian tribal governments the maximum administrative discretion possible, defer to Indian tribes to establish standards, and preserve the prerogatives and authority of Indian tribes.

39.     Given its trust obligations, it has long been the obligation of the United States

---

[14] *Rincon Band of Luiseno Mission v. Schwarzenegger*, 602 F.3d 1019,1028 n. 9 (9th Cir. 2010)

[15] That Plaintiff's do not like the subprime small-dollar lending industry, provides no exception (the same was said in gaming and could equally be said of federally lawful tribal enterprises engaged in fracking, bitcoin mining, marijuana, or various mining, hunting, fishing and agriculture ventures of tribes).

[16] *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 154 (1980) (finding tribal sovereignty is "dependent on, and subordinate to, only the Federal Government, not the States.").

government to "guard" and "protect" tribes, like a guardian protects its ward.  State laws, including usury laws, do not apply to tribes and tribal economic ventures.

40.     Congress has not restricted sovereignty as it pertains to a tribe's use of the internet or engaging in consumer lending.  If the state law interferes with the purpose or operation of a federal policy regarding tribal interests, it is ***preempted***.  *Hoopa Valley Tribe v Nevins*, 881 F.2d 657, 659 (9th Cir. 1989). Therefore, state usury laws are preempted.  States cannot apply their usury laws to a sovereign tribe, particularly if the business activity which the state seeks to infringe upon is occurring on the reservation and is governed by tribal and federal law.

41.     It is an important obligation of the United States government to guard, promote, and protect tribal self-sufficiency, through self-determination and economic development and to encourage the Indians to obtain outside capital and expertise and enter into arrangements with non-Indians to take advantage of Indian sovereignty.

42.     To formalize these policies, Congress enacted The Native American Business Development, Trade Promotion and Tourism Act of 2000 ("**NABDA**")[17] which specifically codifies the foregoing policies and which cannot be diminished by any state law.  The NABDA is required to be *liberally construed in favor of the Indians and ambiguities resolved in favor of the Indians.*[18]

43.     According to NABDA, tribes should make their jurisdictions friendly to outsider investment, and utilize the resources of the private markets (like the mail, telephone, and even the internet) and it should seek outside capital and expertise.[19]  NABDA expressly recognized the obligations of the United States to "facilitate the movement of goods to and from Indian lands and

---

[17] 25 U.S.C. § 4301 *et seq.*

[18] *See, Cheyenne River Sioux Tribe v. Jewell*, 205 F. Supp. 3d 1052, 1062 (D.S.D. 2016) (citing *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 767 (1985); *Bryan v. Itasca County, Minn.*, 426 U.S. 373, 392 (1976); *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89 (1918)).

[19] The Supreme Court has cautioned lower courts not to give "short shrift" to policies codified in statutes, but to construe them generously. *See Ramah Navajo School Board Inc.,* 458 U.S. at 846-47 ("We have consistently admonished that federal statutes and regulations relating to tribes and tribal activities must be 'construed generously in order to comport with . . . traditional notions of [Indian] sovereignty and with the federal policy of encouraging tribal independence.' *White Mountain,* at 448 U.S. 144; *see also McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 174-75 n.13 (1973); *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 690-91 (1965).

the provision of services by Indians" (i.e. online tribal loans), to "promote private investment in the

economies of Indian Tribes" (as Debtor and SPVI have), and to "encourage intertribal, regional,

and international trade and business development" (just as LVD's internet lending involves) and

indeed to "trade freely, and seek enforcement of treaty and trade rights" .

44.     Congress also recognized the obligation of the United States to create "conditions

with respect to Indian lands to— (A) encourage investment from outside sources that do not

originate with the tribes; and (B) facilitate economic ventures with outside entities that are not

tribal entities." Congress further found that the twin goals of economic self-sufficiency and political

self-determination for Native Americans can best be served by making available to address the

challenges faced by those groups— (A) the resources of the private market [i.e. the internet,

outsourced call centers, the US mail and ACH systems, other modern technologies]; (B) adequate

capital.

45.     A key tenant of federal law and policy is the promotion of commercial dealings with

non-Indians.[20]  These dictates are allowed no exception for ecommerce arrangements with non-

Indians.  The law makes clear that tribes do not lose their sovereignty just by contracting for the

special expertise of non-Indian operators and are encouraged to do so.  Consequently, NABDA

encourages and recognizes the legality of the tribal lending operation and structures of the LVD

tribe and the activities of this Debtor, and its members, and a state usury law that stands as an

obstacle to the accomplishment and execution of the full purposes and objectives of Congress,

as detailed in NABDA, is preempted. These principles continue today.[21] Though some may dislike

---

[20] *Cabazon Band of Mission Indians v. Riverside Cty,* 783 F.2d 900, 901 (9th Cir. 1986), *aff'd* 480 U.S. 202 (1987); *Native Am. Dist. v. Seneca-Cayuga Tobacco Co.*, 546 F.3d 1288, 1294 (10th Cir. 2008); *Colorado v. Cash Advance,* Case No. 05CV143, 2012 WL 3113527, at *23 (Colo. Dist. Ct. Feb. 13, 2012).

[21] In support of several tribes recently filing suits against the SBA and Treasury for the CARES act's preclusion of tribal online lenders and casinos from accessing government assistance due to a nearly 70-year-old rule, several members of Congress issued a letter on April 16, 2020, urging Treasury and the Department of Interior to exercise their federal trust obligations in relation thereto.  One might consider it uncommon for criminal RICO enterprises to file suit against the federal government for economic support.  BPL indeed received federal PPP money during covid in support of its online lending operations.

the industry (or disagree with the resultant reach of tribal sovereignty in the modern economy), the relationship of SPVI and the Debtor to LVD is an example of exactly how a Tribe can benefit itself immensely in the furtherance of tribal and federal interests of self-sufficiency.  In 2019, the Fourth Circuit applied the federal interests here, holding that both BPL and Ascension further the federal interests, "In sum…Big Picture and Ascension serve the purposes of tribal economic development and self-governance."[22]

> We reach this conclusion with due consideration of the underlying policies of tribal sovereign immunity, which include tribal self-governance and tribal economic development as well as the protection of 'the tribe's monies' and the 'promotion of commercial dealings between Indians and non-Indians.' *Breakthrough*, 629 F.3d at 1187-88.  The evidence here shows that the Entities have increased the Tribe's general fund, expanded the Tribe's commercial dealings, and subsidized a host of services for the Tribe's members.  Accordingly, the Entities have promoted 'the Tribe's self-determination through revenue generation and the funding of diversified economic development.'

*Williams I,* 929 F.3d at 185 (*citing Breakthrough*, 629 F.3d at 1195).

## TRIBAL LENDING IS LIKE EARLY TRIBAL GAMING

46.    Since 1988, all tribal gaming enterprises are subject to the 1988 federal Indian Gaming Regulatory Act ("**IGRA**").  25 U.S.C. §§ 2701-21.  In passing IGRA, Congress spent three-years carefully deliberating and studying the tribal gaming industry, in order to determine if and how it would diminish tribal sovereignty with respect to gaming and management agreements.  Plaintiff's claims against the Debtor (and requests to the courts) are not an acceptable substitute for the wisdom and exclusive jurisdiction of Congress over such matters.

47.    Tribal sovereignty is generally not codified, because it is not permissive.  IGRA placed limited *restrictions* on sovereignty by governing the relationship between the tribes engaged in gaming and the states.  IGRA furthered federal policy by expressly recognizing, that tribal game was *already* lawful.  No such federal restrictions to sovereignty have been passed

---

[22] *Williams I,* 929 F.3d at 182.

regarding tribal internet lending.  Prior to the enactment of IGRA in 1988, restrictions on tribal gaming did not exist, yet the Supreme Court concluded that Federal pre-emption applied, and state gambling laws did not apply to Indian tribes, even though the games were funded and managed by non-Indians who the majority benefactors of games being played predominantly by non-Indians.[23]

48.     However, a tribe that wanted to launch a casino to fund the governmental obligations of its people often didn't have the expertise, the capital, or the requisite manpower to build and run a casino.  Obviously, tribes would contract with non-Indians to build, finance and operate the casinos, which would employ some of the members of the tribe, and the tribe would receive some dollars from the casino venture to support its tribal government.  At first the non-Indians would do pretty much everything, including taking the risk, funding the "house bank" and working capital, conducting day to day operations, and they received most of the dollars.  In fact, IGRA still contemplates the licensure of non-Indian *owned* casinos on tribal land.

49.     A cursory review of management contracts published by the NIGC, a federal agency, reveals that non-Indians are federally sanctioned to, e.g., approach the tribe, buy the land for development, fund the "house bank", provide their proprietary information and systems, design the facility, set the gaming odds, control the build out, and *exclusively* manage all staffing, training, accounting, budgeting, banking, operation, reporting, investing, and marketing.[24]

50.     IGRA restricts the percentage of the **NET** profits of the non-Indian to 40% of the bottom line for a maximum of 7 years, but typically the non-Indian *cannot* be voluntarily terminated by the Tribe.  However, no restrictions prevent the outsiders from additionally receiving payment for returns on its financing, equipment leases, consulting contracts, and even its own

---

[23] *California v. Cabazon Band of Mission Indians*, 480 U.S. 202,221-22 (1987) (concluding that the federal and tribal interests of tribal sovereignty outweighed the concerns of the state of California regarding criminal activities surrounding the tribes' "high stakes" gambling even though the games were open to the public and primarily involved non-Indians).

[24] *See e.g.*: https://www.nigc.gov/images/uploads/approved-management-contracts/unitedauburnstation.pdf and other contracts published by the NIGC at: https://www.nigc.gov/finance/approved-management-contracts.

management expenses, all deducted directly from the casino *before* the 60/40 split. Consequently, the actual return to the non-Indian can be much higher, particularly in a casino of marginal profitability.   IGRA also obligates a minimum monthly distribution to the tribal government, often subject to reimbursement to the non-Indian casino developer.

51.     In the case of the lending operation of the LVD tribe, in less than four years from the inception of its arrangement with SPVI the LVD tribe received millions of dollars in distributions, tens of millions in equity appreciation, and it owned 100% of not only its lender, BPL, but also the data and technology services of Ascension Technologies.  Together LVD's equity was valued at more than $100 million.

52.     Under IGRA, the Non-Indian manager is granted authority and responsibility over all business affairs in connection with the day-to-day operation and management of the casino, can establish enterprise bank accounts and facilitate payments for operating expenses and capital expenses.  The non-Indian is responsible for reporting to the gaming commission, development and construction debt service, payment of management fees and minimum monthly disbursements to the tribe. The non-Indian manager also typically provides, e.g., operating budgets, marketing services, investment of reserve funds, employee management, setting business hours, negotiating and entering into contracts on behalf of the business, proprietary information techniques and methods of designing, selecting, maintaining, operating, marketing, developing and customizing games, proprietary information techniques and methods of training employees in gaming, proprietary business plans, projections and marketing, advertising and promotion plans, strategies, and systems. The non-Indian manager may provide these services from off the reservation using off site employees.  Indeed, Plaintiffs would call this "rent-a-tribe" but not for the codifying of it by Congress, which demonstrates a gross misunderstanding of inherent (pre-existing) tribal sovereignty.  Nowhere has Congress diminished tribal sovereignty in any relevant way with respect to ecommerce or tribal lending.

53.     Unlike many gaming contracts between a tribe and non-Indians, the distributions

to the LVD tribe were not subject to recoupment by the non-Indian, and SPVI could be fired at any time if its pricing was not market competitive, or its services were unsatisfactory. Notably, the expenses of SPVI were *not* paid by the tribal lender and SPVI initially incurred substantial losses at times under the Servicing Agreement.

54.      If the Plaintiffs' "rent-a-tribe" interpretation and RICO theories were applied to tribal gaming, the tens of billions of dollars a year flooding into Indian country and hundreds of thousands of jobs created would not exist.  Congress is expressly aware of tribal online lending and has taken no action to restrict it. [25]

55.      The LVD tribe has a casino which followed the typical pattern. The LVD Indians learned the business and eventually took over full operation of the casino.  Unfortunately, profits from the LVD casino declined and met less than 10% of the governmental needs of the LVD tribe, making its diversification into online lending all the more important. In January 2020, the LVD tribe entered into a 20-year agreement with an Australian sports betting company for the Australian non-Indian company to provide a tribal sports betting operation with the non-Indian company to offer online sports betting through the LVD tribe.

56.      Unlike tribal gaming, there is no federal statute expressly governing or limiting online lending by tribes.  The Supreme Court has admonished lower courts not to give "short shrift" to the important federal policies favoring tribal self-sufficiency, even in the absence of federal regulation.[26]   Tribes are statutorily encouraged by the NABDA to engage in forms of

---

[25] For example: United States Senators Steve Daines and Jon Tester wrote to the Director of the CFPB in support of tribal sovereignty specifically in the context of online lending. The Senators reminded Director Cordray that, as it relates to the CFPB's rulemaking process for payday loans, "**[m]eaningful tribal consultation is essential to upholding the federal trust responsibility, honoring the government-to-government relationship, and ensuring federal regulations take into account the sovereign status of tribal governments.**" Id. The Senators also reinforced that meaningful tribal consultation is necessary to **"ensure the preservation of tribal sovereign rights and guard against harmful impacts on Indian tribes in the rulemaking process."** Id. (emphasis supplied)"; In 2016, tribes even testified about their online lending operations to the US House of Representatives Committee on Financial Services.

[26] *Ramah Navajo School Board Inc. v. Bureau of Revenue* 458 U.S. 832, 846-47 (1982) ("We have consistently admonished that federal statutes and regulations relating to tribes and tribal activities must be "construed generously in order to comport with . . . traditional notions of [Indian] sovereignty and with the federal policy of encouraging tribal independence." *White Mountain, supra,* at 448 U. S. 144; *see also McClanahan v. Arizona State Tax Comm'n,* 411 U.S. at 411 U. S. 174-175, and n. 13; *Warren Trading Post Co. v. Arizona Tax Comm'n,* 380 U.S. at 380 U. S. 690-

commerce like online tribal lending, and so LVD did.

57.    Moreover, there is comprehensive tribal regulation of consumer lending by LVD's regulatory agency, the Tribal Financial Services Regulatory Agency ("TFSRA"), in accordance with the 2010 Federal Consumer Financial Protection Act ("CFPA").   The CFPA formed the Consumer Financial Protection Bureau ("CFPB") and gave tribes the same status as states, respecting them as regulators of their online lending operations.[27]   Today, the CFPB works diligently with online tribal lenders, including the LVD tribe, on a government-to-government basis, to discuss its rulemaking ideas and consider the impact its rules will have on tribal economies.[28] In fact, by June of 2014, RRTL registered with the CFPB portal to co-regulate consumer borrower complaints with the CFPB.   By May 2015, LVD's Chairman Jim Williams even submitted a statement to the CFPB regarding its potential rules relating to small dollar lending.   The Chairman has frequently met with the CFPB ever since.

58.    The Plaintiffs are private parties, not a governmental agency.   If internet tribal lending by the LVD tribe was not appropriate, and was in violation of state usury laws, and was a RICO criminal enterprise, Congress, the CFPB, and other federal agencies would have shut it down a long time ago.

---

691. This guiding principle helps relieve the tension between emphasizing the pervasiveness of federal regulation and the federal policy of encouraging Indian self-determination.")

[27] In the very same act that recognized Tribes as regulators, Congress rejected an amendment to cap interest rates based on geography of the borrower: "In addition, one proposed amendment would have capped the interest rate at which loans could be offered at the maximum rate permitted by the State in which the consumer resided.   S. Amdt. 3746 to S.3217, 111th Cong. (introduced May 13, 2010) ("Whitehouse Amendment").   That proposal was rejected.  Id. (rejected May 19, 2010)." **There is no federal usury cap**.

[28] The relationship between the CFPB and tribal governments is expressly set forth on the CFPB web site in "**working with tribal governments**" at: https://www.consumerfinance.gov/tribal/, which publishes information for tribal regulatory authorities, and states "[p]art of [the CFBP's] commitment to protecting consumers across the country means paying particular attention to the needs and concerns of Indian Country."   See also: https://files.consumerfinance.gov/f/documents/cfpb_strategic-plan_fy2018-fy2022.pdf at 2 (Acting Director recognized the same abuse LVD and Martorello uncovered during the 2013 era of illegal "Operation Chokepoint" which Plaintiffs so frequently cite, Mr. Mulvaney commented that prior leadership of the CFPB risked "trampling upon the liberties of our citizens or interfering with the sovereignty or autonomy of the states or Indian Tribes. I have resolved that this will not happen at the Bureau.";        https://files.consumerfinance.gov/f/documents/cfpb_payday_nprm-2019-reconsideration.pdf at 30 (CFPB since "has engaged in consultation with Indian tribes about this [payday loan rule] proposal. The Bureau held a consultation on December 19, 2018, at the Bureau's headquarters. All Federally recognized Indian tribes were invited to this consultation, which generated frank and valuable input from Tribal leaders to Bureau senior leadership and staff about the effects such a proposal could have on Tribal nations and lenders.") (emphasis added).

## ROUTINE TRIBAL NATION BUILDING

59.     Development arrangements with far less Indian participation, or tribal benefit, than the LVD lending operation have been approved by the courts and the United States Government. An example is *Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966, 968 (10th Cir. 2005).  In *Shivwits*, a non-Indian specializing in outdoor advertising approached the Shivwits Band of Paiute Indians (the Band) and proposed that the Band purchase land, with money provided by Kunz, a non-Indian, south of St. George, Utah (the City) along the Interstate 15 corridor, transfer that land to the federal government to be held in trust for the Band, and lease the back land to Kunz on a long-term basis so that Kunz could erect and maintain advertising billboards thereon free from the restrictions of state law.  *Id.* at 969.  Thus, not only was the billboard business itself not even Indian owned or operated, the idea came from a non-Indian business, as did the capital for the purchase of land and the entire construction and operation of the of the non-tribal billboard business – with Kunz receiving $2 million and the tribe simply receiving $60,000 lease payments over the 20-year term, an undiscounted return to the tribe of 3%. The percentage revenue split and non-Indian status of the business were irrelevant.

60.     The State of Utah and City of Saint George issued a stop order and threatened criminal action against Kunz, claiming that the billboards were in violation of state law and city zoning, but the Tenth Circuit held that the state and municipal laws had no effect on tribal land and that the state could not forbid or regulate Kunz's billboards.  *Id.* at 983.  In reaching this holding, the court rejected precisely the argument made by Plaintiffs, that the Band will derive little economic benefit from the parcels and the leases, and that Kunz had improperly benefited from the Tribe merely marketing an exemption to state law.   Instead, the court observed that the balancing of tribal interest is to be taken on a relative basis, "the Band's income from the leases of the parcels at issue now constitutes its greatest source of revenue."  *Id.* at 982.  "Not only are the billboard leases providing the Band with a significant portion of its current revenue, the record on appeal establishes that the land is an important asset for the Band in terms of future economic

19

development." *Id.* at 983.   Just as California had no authority to forbid "high-stakes" casino gaming on the Cabazon Reservation and Utah had no authority to forbid Kunz's Shivwits Reservation billboards, no state has the authority to forbid consumer lending by the LVD tribe on the Lac Vieux Desert Reservation. [29]

61.    The 10th Circuit in *Shivwits* completely rejected the arguments the Plaintiffs will make in this Chapter 11 case.  It doesn't matter if the non-Indian approaches the tribe.  It doesn't matter if the non-Indian wanted to benefit from the Indian exemption from state law.  It doesn't matter that the parties were concerned about regulatory threats.  It doesn't matter if the non-Indian funded money.  It doesn't matter if the non-Indian was the CEO of the business, or in the case of Kunz, a non-Indian owned and operated reservation-based business. It doesn't matter who made more money.   The policy of self-determination disfavors courts second guessing the business judgments of the tribe and federal law and policy promote just such ventures.   Instead, if the business complies with Federal and tribal laws, state law is preempted, and the operation is legal.

## THE DEBTOR AND THE OTHER DEFENDANTS COMPLIED WITH THE APPLICABLE LAW

62.    SPVI provided the LVD tribe with growth strategies to increase Indian jobs on the reservation and enhance the management capabilities of LVD executives, did data analytics, developed marketing lead strategies, provided credit analysis, arranged financing (because many lenders, like many vendors, are initially hesitant to loan money to borrowers with sovereign immunity), and performed ministerial operational tasks delineated in the Servicing Agreement.

63.    The LVD lending business was not like any other online lending operation which will be cited by the Plaintiffs, which in many cases didn't even involve a tribe, or had entirely different structures or were blatant frauds engaged in egregious federal lending law violations that later sought to buy immunity to defend against their existing lawsuits.

---

[29] *Cabazon Band of Mission Indians,* 480 U.S. at 216 (citing *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333-35 (1983)).

64.    Numerous expert lawyers at GT created and amended every contract and considered every issue.  They examined the consumer loan agreements, the tribe's laws and regulations, the tribal jurisdiction and dispute resolution procedures, third party debt facilities, and vendor contracts, and the Servicing Agreement with SPVI.  They concluded that the business was legal and not subject to state usury laws.

65.    Experienced lawyers for the LVD tribe were also intimately involved in the day-to-day on-reservation activities and agreed regarding the legality of the operation.[30]

66.    To obtain a loan, customers must visit online LVD's on-reservation tribal server, which hosts the website and controls the application process.  The last act necessary to consummate the loan agreements – along with all non-ministerial decisions – occurred **on the Reservation**.

### TRIBAL CONTROL

67.    Plaintiffs attempt to manufacture a fiction that the Tribe was not in control and therefore not the true lender.[31]  The district court's findings in *Williams* are not binding on this Court (or any other court) and the issue regarding control over LVD's lending operations remains disputed.  However, even if the Plaintiffs are correct, <u>this issue is legally irrelevant</u>.  No legal basis exists for anyone but Congress to dictate an ecommerce law comparable to IGRA in gaming.  It

---

[30] The lawyers and opinions delineated in Exhibit A are not the only lawyers recognizing the legality of tribal lending. In fact, Martorello (a non-Indian) has been left arguing the official position of the NCAI (as authored in amicus by the same attorney who structured the RRTL lending business, Ms. Jennifer Weddle).  In any event, Pepper Hamilton's Richard P. Eckman, *et al.*, Update on Tribal Loans to State Residents, 68 The Business Lawyer, ABA Business Law Section, 2 (February, 2013) ("**Most agree that federally recognized, sovereign tribes have the authority to engage in internet lending to state residents without those tribes being subjected to state authority.**"); Victor D. Lopez, When Lenders can Legally Provide Loans with Effective Annual Interest Rates Above 1,000 Percent, is it Time for Congress to Consider a Federal Interest Cap on Consumer Loans?, 42 J. Legis 36 (2016) (same); Blake Sims & Justin Hosie, Tribal Loans to State Residents—The Next Test of Sovereign Immunity, Consumer Fin. Servs. Newsl. (Am. Bar Ass'n), Winter 2011 (**"[T]ribes may continue to make loans to non-tribal residents, following only tribal law, until Congress passes federal legislation clarifying the respective rights of the sovereigns involved."**).

[31] The *Williams* court reached an interlocutory conclusion that Martorello is the "de facto head" of LVD's tribal lending operations, which was affirmed by the Fourth Circuit.  *See Williams II,* 59 F.4th at 90.  As indicated above, however, even if Plaintiffs are correct, which issue remains contested, this is completely irrelevant to the arm of the tribe and federal preemption analyses.  In other words, Tribes are allowed to hire non-Indian CEOs or management companies to run their businesses without losing their sovereign rights to the states.

is not the ministerial details of who did what, or if the LVD tribe accepted the consulting advice too much, or if the LVD tribe had yet learned enough to reject recommendations,[32] or if/how the LVD tribe decided to document their approvals.  The binding legal contract between the LVD tribe and SPVI unequivocally gives ultimate legal authority to the Tribe, in its sole and absolute discretion, to approve or reject (or revoke) every single aspect by which their business operated. The same is true of the identical agreement between BPL and Ascension, and the same is true of the Debtor's LSA with BPL.  Plainly, neither the Debtor nor Martorello may force the elected tribal officials to pass, revoke or amend the 200 Tribal Council resolutions related to its lending business.  The Debtor may not permit, regulate, license or prohibit economic activity on the LVD reservation, only the tribal government may do that in its own wisdom and of its own accord.  The same goes for the acceptance or rejection of any given business recommendation.

### CERTAIN NON-TRIBAL SMALL DOLLAR LENDERS ARE ALSO NOT SUBJECT TO STATE USURY LAWS AND THEIR RATE EXPORTATION MODELS ARE THE EXPRESS POLICY OF THE FEDERAL GOVERNEMENT

68.    Tribes aren't the only ones who structure their operations to minimize exposure to state usury laws.  For example, bank lenders, and others, engage in high interest consumer loans utilizing banks in Utah, South Dakota, Delaware and other favorable states as the initial lender to avoid less favorable state usury laws.  The banks often enter into arrangements with non-banks to perform significant functions.  That lending structure has been supported by the CFPB, the Federal Reserve, the US Treasury, the GAO, the FDIC and the OCC, even though the non-bank financial technology partner makes more than 90% of the profits, uses its own brand as the face for the lender, performs nearly all of the front-end and loan performance functions, originates the

---

[32] LVD Chairman Williams has been very clear with regard to his views of the offensive and insulting nature of Plaintiff's allegations,    https://nativefinance.org/news/lvd-chairman-rent-a-tribe-is-an-offensive-slur-that-should-be-retired-permanently/ "At a time when America needs greater civility and honest discourse, a term like 'rent-a-tribe' should be retired permanently," Williams concluded. "This term is a shameful relic of the past. American Indian tribes' pursuit to operate businesses to generate revenue and ensure their self-sufficiency and self-determination should be applauded, not villainized or discounted."

loans carrying triple digit interest rates, and immediately sells the loans to non-bank third parties.[33]

Although these loans are made nationwide, the banks utilize federal preemption concepts (just

like the LVD lending operation) to export the favorable Utah or South Dakota rates to the rest of

the country even though the nominal bank lender is minimally involved and makes a small percent

of the revenue.[34]  Even though these arrangements have been criticized by some as rent-a-bank

---

[33] See, FDIC Examination **Guidance for Third-Party Lending** As of July 29, 2016 at www.fdic.gov. (Third-party lending arrangements may include the following: "**Insured institutions originating loans for third parties** – In these situations, an insured institution typically serves as the originator for an entity that lacks the necessary licenses or charter to lend on its own behalf **or seeks to take advantage of the institution's ability to export interest rates**. **Often, the insured institution does not retain significant amounts of loan volume generated, but rather holds the loan for only a short period of time before selling it to the third party, which typically secures the ultimate funding source**); See also: https://www.fdic.gov/news/news/financial/2005/fil1405a.html#foot1 updated in November 2015, citing the "**typical charge is… an APR of nearly 400%**", and "Insured depository institutions may have payday lending programs that they administer directly, using their own employees, or they may enter into arrangements with third parties. In the latter arrangements, the institution typically enters into an agreement in which the institution funds payday loans originated through the third party. These arrangements also may involve the sale to the third party of the loans or servicing rights to the loans. Institutions also may rely on the third party to provide additional services that the bank would normally provide, including collections, advertising and soliciting applications."

[34]  S*ee, Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359 (D. Utah 2014): There, the servicer was the face of the transaction, facilitated origination, performed a credit check, determined whether to extend the credit and purchased the loans from the lender after 2 days.  The Court held that the Federal Deposit Insurance Act preempted the plaintiff's claims under California law [similar to tribal preemption of state law under the Indian Commerce Clause].  The court analogized the partnership between the bank and Bill Me Later to a credit card program and stated that such program was subject to supervision by federal banking authorities.  See 23 F. Supp. 3d at 1366–68.  **Even if the partnership was simply a sham to avoid state usury law, the court explained, it would be the task of federal banking regulators, not courts, to address problems that resulted from that partnership and similar arrangements**.  See id. at 1367–68.  *See also, e.g., Hudson v. ACE Cash Express, Inc.*, 2002 WL 1205060 (S.D. Ind. May 30, 2002): "The plaintiff alleged that the purpose of the partnership agreement between ACE and the bank was to circumvent Indiana's usury laws, but the court held that **even if circumvention of state usury laws was the purpose of the agreement, § 85 of the National Bank Act [similar to tribal preemption of state law] made such an agreement lawful**.  See id. at *4.  The fact that the agreement required ACE to purchase a **95% interest** in any loan made under the agreement was **irrelevant** to the court, as was the fact that ACE was responsible for collecting payments under the loans. See id. at *3.  **The court saw "no basis for drawing jurisdictional boundaries" between federal and state banking regulation based on the purpose of an arrangement between a bank and a non-bank entity**.  Id. at *6."*; Beechum v. Navient Solutions, Inc.*, 2016 WL 5340454 (C.D. Cal. Sept. 20, 2016): The court held that when assessing whether a transaction falls under a constitutional or statutory exemption from the state's usury laws, the court may only look to the face of the transaction.  **The non-bank lender originated, underwrote, marketed, and funded private student loans for which the bank would be identified as the lender The non-bank lender would subsequently purchase 100% of the loans** from the bank within 90 days of disbursement for principal, plus accrued interest, and less the amount paid for indemnification of loan loss; *Meade v. Avant of Colorado, LLC*, 2018 WL 1101672 (D.Colo.) **consumer applied for and obtained loans from servicer website; servicer buys loans within 2-days, paid all lender legal fees and fees to initiate the program, bore all expenses incurred, determined which loan applicants received loans and bore all costs of making such recommendations, was responsible for compliance with federal and state laws, indemnified the Lender, bore all risk of default, and conducted underwriting, servicing, and collection**; **Servicer retained 99% of profits** on the loans; *Ubaldi v. SLM Corp.,* 852 F.Supp.2d 1190 (N.D. Cal. 2012) where the court stated that a 5% retained interest would have "some persuasive force" as a significant stake: "In Hudson, the bank 'made the loan to Hudson and then sold a participation interest to ACE,' retaining a 5% stake in the loan. 2002 WL 1205060 at *7. The Hudson court noted: 'The record shows that Goleta actually made the loan **and retained an even greater financial interest in its loan to Hudson than the national bank in Krispin, which the Eighth Circuit held sufficient to invoke the National Bank Act in that case**." Id. at *5-6 (citing Krispin, 218 F.3d at 924). Hudson concluded as a matter of law that the usury claims were expressly preempted because '§ 85 of the National Bank Act governs the fees and interest rate that Goleta charged Hudson in this case.' Id.".  The court agreed

structures, they are specifically authorized by the FDIC.  This is consistent with the current federal policy of expansion of consumer access to credit, consumer choice, and innovations in banking operations and structure. [35]

69.    The concept of federal preemption of state interest rates is rooted in the power of Congress, and has always been implicit in financial transactions since citizens of one state were free to visit a neighboring state to receive credit at foreign interest rates.[36] In the early years after the founding of the United States, national banks often faced regulatory challenges waged by hostile state regulators against national banks who made loans to out-of-state borrowers under terms that state regulators alleged were usurious. But nearly 200 years ago, in *McCulloch v. Maryland*, the Supreme Court held that federal law is supreme over state law with respect to national banking. [37] Congress ended state interference in national banking by passing the National Bank Act ("NBA") in 1864 to facilitate a national banking system. Since the passage of the NBA, the Supreme Court has repeatedly made clear that the States can exercise no control

---

with Hudson that public policy concerns arising from the "rental" of charters as potentially suitable for regulatory redress, but reasoned that the federal banking regulatory scheme (much like tribal development) required uniform application rather than fact-intensive difficult line drawing by the courts predicated on "the subjective purpose of those engaged in the transaction and/or the precise extent of financial risk accepted by the national bank". (emphasis added).

[35] See May 20, 2020 joint press release by Federal Reserve Board, FDIC, NCUA and OCC at https://www.fdic.gov/news/news/press/2020/pr20061.html?source=govdelivery&  to "recognize the important role that responsibly offered small-dollar loans can play in helping customers meet their ongoing needs for credit from temporary cash-flow imbalances, unexpected expenses, or income shortfalls, including during periods of economic stress, natural disasters, or other extraordinary circumstances such as the public health emergency created by COVID-19" and "encourage supervised banks, savings associations, and credit unions to offer responsible small-dollar loans to customers for consumer and small business purposes" including a fact sheet summarizing studies proving that small dollar loan products meet the credit needs of families.  See also; CFPB "statutory mandate to promote competition, innovation, and consumer access within financial services. To achieve this goal, the new office will focus on creating policies to facilitate innovation, engaging with entrepreneurs and regulators, and reviewing outdated or unnecessary regulations" https://www.consumerfinance.gov/about-us/newsroom/bureau-consumer-financial-protection-announces-director-office-innovation/ and "building a bridge to credit visibility" https://www.consumerfinance.gov/about-us/events/archive-past-events/building-bridge-credit-visibility/; Treasury "A Financial System that Creates Economic Opportunities – Nonbank Financials, Fintech, and Innovation report: https://home.treasury.gov/sites/default/files/2018-08/A-Financial-System-that-Creates-Economic-Opportunities---Nonbank-Financials-Fintech-and-Innovation_0.pdf; OCC office of innovation promoting a non-bank rate exportation lending license, https://www.occ.treas.gov/topics/responsible-innovation/index-innovation.html; and GAO recommending "expansion of credit" urging more certainty "for fintech lenders interested in pursuing partnerships with banks" https://www.noonanandlieberman.com/updates/gaos-report-to-congress-on-fintech-recommends-agencies-provide-clarification-on-lenders-use-of-alternative-data/

[36] *Marquette Nat'l Bank*, 439 U.S. at 318.

[37] *McCulloch*, 17 U.S. 316 (1819).

over national banks unless permitted by Congress. As a result of this federal preemption, a national bank may export a favorable interest rate from its home state in transactions with borrowers from other states. There is no such thing as a state-law claim of usury against a national bank.

70.     The National Bank Act, Rev. Stat. § 5197, as amended, 12 U.S.C. § 85, provides that a national bank may charge interest 'on any loan' at the rate allowed by the laws of the State in which the bank is "located." *Marquette Nat. Bank v. First of Omaha Corp.*, 439 U.S. 299, 308 (1978).[38]  "[A] national bank is 'located' for purposes of § 85 in the State named in its organization certificate or in a state in which it has its main or branch offices." *Pacific Capital Bank v. Connecticut*, 542 F.3d 341, 352 (2d Cir. 2008) (quotations omitted). In addition, "[a]t a minimum, the bank must demonstrate, through proof in admissible form, that at least one significant non-ministerial action associated with the account took place in the bank's 'home state.'" *Citibank v. Hansen*, 28 Misc. 3d 195, 196 (N.Y. Misc. 2010). The three non-ministerial functions are the "approval, disbursal and the extension of the credit." Comptroller of Currency Interpretive Letter No. 822 at 12. With regard to approval, "[i]f . . . a loan is subject to non-discretionary criteria [such as a credit-scoring model] that will be applied mechanically, … the loan is approved where the decision to apply those criteria to that loan is made." *Id. at 12*. Here, the Servicing Agreement gave the tribal managers, who were located on the reservation, the ability to approve (or reject) each of the tribal loans and any recommendation received from SPVI or Ascension. Consequently, this non-ministerial function took place on the Reservation. The instruction to

---

[38] In that case the Supreme Court specifically addressed the risk that its decision would undermine state usury laws and found that it was implicit in the provision of the National Bank Act that applied the interest rate of the bank's home state, **not the customers'**. *Marquette Nat. Bank,* 439 U.S. at 318-19 (1978) ("Petitioners' final argument is that the 'exportation' of interest rates, such as occurred in this case, will significantly impair the ability of States to enact effective usury laws. This impairment, however, has always been implicit in the structure of the National Bank Act, since citizens of one State were free to visit a neighboring State to receive credit at foreign interest rates. Cf. 38 Cong. Globe, 38th Cong., 1st Sess., 2123 (1864). **This impairment may in fact be accentuated by the ease with which interstate credit is available by mail through the use of modern credit cards. But the protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court.**") (emphasis added).

disburse funds was also issued from the Reservation as the reservation-based employees processed the credits to the consumers accounts.

71.     The final non-ministerial function is "the site from which the first communication of final approval comes."[39]  This took place on the Reservation. Indeed, the lenders are incorporated under tribal law, headquartered on the Reservation, and undertake **all** of these non-ministerial functions on the Reservation.  If the National Banking Act and its benefits of preemption of state law are any barometer as to what is appropriate for tribal preemption, and the ability for a tribal lender to engage non-tribal fintech support, the legality of the LVD tribal lending operation is unquestionable.  The preemptive effect of the Indian Commerce Clause certainly deserves no less consideration than the National Banking Act, considering the former benefits from federal policy interests in furthering tribal economic development, where bank rate exportation does not.

72.     It is perfectly permissible for an entity to deliberately structure its affairs with this test in mind.  "[T]he court does not question [the banks'] right, consistent with federal law, to structure its credit line and credit card affairs in a manner that enables it to avoid and circumvent the usury limits of th[e] state," provided that it "has, indeed, so structured its affairs."  *Citibank v. Hansen*, 28 Misc. 3d 195, 201 (N.Y. Misc. 2010).   The same is true for tribal internet lending which is structured to comply with applicable law.  The fact is that state usury laws are not applicable to tribal lending.

73.     Under Restatement (Second) of Contracts 188,[40] the reservation also is the place

---

[39] https://www.occ.gov/topics/charters-and-licensing/interpretations-and-actions/1998/int822.pdf

[40] A "[T]he Indian Commerce Clause makes 'Indian relations . . . the exclusive province of federal law.'" *Seminole Tribe v. Florida*, 517 U.S. 44, 60 (1996) (quoting *Cnty. of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234 (1985)); U.S. Const. art. I, § 8, cl. 3; *see also White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143 (1980) ("[t]he unique historical origins of tribal sovereignty **make it generally unhelpful to apply . . . standards . . . that have emerged in other areas of the law.**"). To that end, the Supreme Court "has relied on the Indian Commerce Clause as a shield to protect Indian tribes from state and local interference . . . ." *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 153-54 (1982). As such, the Supreme Court has consistently required courts to assess the applicability of state law through **an interest-weighing analysis whenever it impacts on-reservation business activity**. *See, e.g.*, *Ramah Navajo School Board, Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 837 (1982); *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 333 (1983); *Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 155 (1980). Here, LVD's lending operations are firmly rooted on the reservation, requiring the Court to engage in an interest-

of contracting (i.e. consummation), the place of negotiation (the tribal server), and the place of performance (since the reservation is where payments were mailed to, or electronically received, and then uploaded to the bank and loan accounts to apply against the consumer accounts). In addition, the risk of a default on the loan agreement is carried on the lender's balance sheet and the effect of a default is felt upon the reservation, not in the state of consumer residence. Much like the interest of the federal government in tax collections, the tribe's interest far outweighs and constitutes a "materially greater interest" in the loans than any state regulation. [41]

74.     In fact, were a balancing conducted pursuant to the interest-weighing analysis first established forty-three years ago in *Bracker*, the tribal and federal interests in generating revenues to provide vital services to an impoverished tribal community would prevail.

75.     In Texas, Credit Access Businesses ("CABs") have charges for small dollar consumer lending similar to those of the LVD tribe. In the CAB model the CAB is the face of the lender and performs all of the front-end and loan performance functions, but the lender provides the dollars to be loaned, and it receives the non-usurious "interest" rate (usury cap is 10% APR) while the CAB gets all of the remainder as fees for a combined triple digit average percentage rate to the borrower. This economic split, on a net basis, is not unlike the fintech/bank partnerships above, approximately 90% to the CAB and 10% to the lender. [42]

76.     An even more striking example involves Low Income Housing Tax Credits

---

[footnotes]

weighing analysis. Because LVD's interests and federal interests in promoting Native American self-governance and self-determination outweigh a state's interests in this instance, state usury laws are preempted.

[41] As demonstrated in *Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966, 968 (10th Cir. 2005), tribal interests are measured on a relative basis and long-term basis, not a nominal or intermittent basis. In balancing interests, tribal interests additionally benefit from the federal interests' inextricable link to tribal economic development. Here, LVD's interest are as important to it as the federal income tax is to the US government, last measured at nearly 42% of the budget.

[42] The Texas Office of Consumer Credit Commissioner details the statutory fintech-lender relationship here: https://occc.texas.gov/sites/default/files/uploads/what-is-a-cab-6-26-14.pdf; see also the economic breakdown within the "Components of the Finance Charge" at 90% net vs 10% net: https://www.checkngo.com/docs/checkngo/legal/states/tx/tx-online-finance-schedule.pdf. Dozens of comparative examples exist across Texas are publicly available, and similar statutory arrangements to the CAB model have existed in FL, OH and MD. CABs are prevalent across the state of Texas and was upheld by the 5th Circuit in *Lovick v. Ritemoney, Ltd.,* 378 F.3d 433 (2004).

("LIHTC"). Because tribes are federally tax-exempt entities, non-Indian investors may own up to 99 percent of a tribal project for the 10-year period of the tax credits.[43]   The same is true for New Market Tax Credits where the non-Indian investor may own up to 99 percent of the tribal project for seven years.  In both cases, it is common for the investors to transfer ownership of the project to the Indians after the tax credit period has expired.[44]   In this case, the entire operation was transferred to the LVD tribe in four years, resulting in several millions of dollars for the Tribe.[45]

77.     In what could be described as a perfectly legal rent-a-municipality structure, an industrial organization will team up with a municipal organization to issue tax free industrial revenue bonds at low rates.  The industrial organization gets a new facility by using the tax attributes of a municipality and the municipality gets a new business resident.  Similarly, private activity bonds are nominally issued by the governmental entity for the benefit of the private party.

## THE CURRENT CONTROVERSY

78.     The Debtor, Martorello, and several others, including the LVD tribe, have been sued by the Plaintiffs in several states since 2017.  It is no secret that this tribal lending structure, in fact the entire tribal lending industry consisting of over a dozen tribes, was designed to enable internet lending to consumers in small dollar amounts with annualized interest rates much higher than permitted by state usury laws.  This is much like the casinos which are structured to enable Indians to provide gambling notwithstanding state gambling laws and the internet bank lending operations which also rely on federal preemption to ignore state usury laws.  But, the sovereign rights of Indian tribes simply do not depend on the respectability of the business chosen by the tribes.

---

[43] *Low Income Housing Tax Credits 101,* Travois, Inc. (2013).

[44] 26 U.S.C. 45d.

[45] While Plaintiffs prefer to measure only distributions to RRTL or BPL's tribal owner, which is akin to measuring a company's value to tis owner based solely on its dividend policy, the Fourth Circuit held even that 2% of **revenue** increasing to 6% over time was a substantial interest to LVD.  Still, one benefit they repeatedly ignore is the **value of LVD's equity in its lending LLCs,** which has been estimated to be $25 million in additional value to the Tribe at the date of sale, and well in excess of $100 million upon maturity of the note.

79.     States provide regulatory structures for high-cost small dollar lending in approximately 30 states.  For example, in Virginia, where the Debtor is accused of illegally violating the Virginia usury laws, consumer loans over $2500 were exempt from the usury laws entirely until 2020 (i.e., during the entire time period complained of by the Plaintiffs).[46]  Also, as late as 2018, the Virginia State Corporation Commission Bureau of Financial Institutions issued a letter stating that "an arm of the [tribe]" was "not required to be licensed under the laws that are enforced by the Bureau".  Yet, the Plaintiffs and others contend this type of business constitutes predatory lending, is unfair to Virginia borrowers, and should be eliminated.

80.     But that's up to Congress.  And the fact is that Congress has rejected a federal interest rate cap as recently as 2010, in the very same law that designated tribes as regulators of their consumer lending operation and created a co-regulatory federal agency, the CFPB.[47]  Congress went so far as to prohibit the CFPB from issuing regulations establishing a usury limit.[48]  Tribal online lending structures are legal until Congress, not the states, decides to restrict Indian sovereignty. Congress has not limited the ability of tribes to enter into relationships with non-Indian service providers.  *Williams I*, 929 F.3d at 180 (noting that "the district court cited to no authority suggesting that a tribe must receive a certain percentage of revenue from a given entity for the entity to constitute an arm of the tribe" and that tribal revenue creation "both now and in the future" was likely dependent upon the Tribe's financing arrangement with the non-tribal Debtor).

81.     Martorello, SPVI, the Debtor, and the LVD tribe's experts all did their homework

---

[46] At the time the tribal loans were issued in *Williams* Virginia had no such cap on consumer loans over $2,500.  In fact, **the Virginia consumers could have walked into one of dozens of payday storefronts located across the state of Virginia, which were licensed by Virginia to offer small dollar loans at a comparable all-in cost to those at issue in the case of the Tribe**.  In August of 2020, i.e. *after* the consumer loans complained of by the Plaintiffs, the governor of Virginia signed into law the Virginia Fairness in Lending Act of 2020. The enactment of this act brought new restrictions on lending in the state, including removing the exemption for consumer loans over $2,500. *See* Va. Code Ann. § 6.2-1520.

[47] "In addition, one proposed amendment would have capped the interest rate at which loans could be offered at the maximum rate permitted by the State in which the consumer resided.  S. Amdt. 3746 to S.3217, 111th Cong. (introduced May 13, 2010) ("Whitehouse Amendment").  That proposal was rejected.  Id. (rejected May 19, 2010)."

[48] 12 U.S.C. 5517(o).

and structured the LVD tribe operation to comply with the law.  Complying with the law doesn't make someone liable.

82.     The Plaintiffs say that the structure was a sinister scheme to avoid the usury laws and then hide behind sovereign immunity.  They say the Tribes, disgracefully, are renting out their sovereign immunity so that non-Indians may commit criminal acts.  They say it was all a big sham, so that Martorello was the "de facto owner" or lender, so that he could be liable under usury laws. They say that Eventide and Martorello made too much money and the LVD tribe did not learn enough, did not perform enough functions and did not receive enough of the proceeds.  Therefore, they contend that the Debtor, Martorello and the Tribe were illegally violating state usury laws. And, because they were knowingly violating state usury laws, the Debtor, Martorello, the LVD tribe, and others, are allegedly corrupt racketeers, violating RICO's "collection of unlawful debt", and they were unjustly enriched.  Effectively, the Plaintiffs say that the Debtor, and the other defendants, should be liable for doing exactly what the federal government, the CFPB and the NABDA encourage.

83.     The fiction is necessary because they cannot get past the fact that the LVD tribe consumer lending operation was specifically designed to be legal, and is not subject to state usury laws, much like bank small dollar lending and credit card operations are often based in South Dakota or Utah.  These bank structures have been upheld by the courts, even when the loan is purchased immediately by the non-bank and the nominal bank lender is minimally involved.[49]

84.     Because of federal preemption, if the federal government dislikes tribal lending, or the relationship between tribes and outside vendors and service providers, then it can pass laws or enact regulations to achieve that objective.  But so far, the federal government has adopted a policy that economic empowerment of Indian tribes outweighs the states' concerns about interest

---

[49] *Beechum v. Navient Solutions, Inc.*, 2016 WL 5340454 (C.D. Cal. Sept. 20, 2016): *Hudson v. ACE Cash Express, Inc.*, Case No. 01-1336, 2002 WL 1205060 (S.D. Ind. May 30, 2002); *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359 (D. Utah 2014); *Meade v. Avant of Colorado, LLC*, 307 F. Supp. 3d 1134 (D. Colo. 2018).

rates.  If the Plaintiffs and the states, and others, disagree they can take it up with Congress and have laws passed regarding these loans, similar to federal laws governing casinos and bank lenders.[50] Yet, after twelve years of operations LVD's lending operations remain unimpeded with the support and under the nose of the federal regulators.

85.     Because restrictive laws or regulations regarding tribal lending do not exist, the Plaintiffs throw around a bunch of pejorative statements like sham, and *de facto* head, and scheme, and rent a tribe, which, to the Plaintiffs, is apparently defined as complying with the law and implementing Federal policy.[51] They discount the intelligence, work ethic and judgment of the tribal leaders and point to lending arrangements by others that DID defraud people, or didn't actually involve tribes at all, and weren't structured to comply with federal lending laws.  They say that the benefit to the LVD tribe was too little.  And they point to <u>failed</u> and improper attempts by government authorities to destroy the tribal lending industry.

86.     With the exception of the recent district court ruling against Martorello in the *Williams* litigation, there are no court rulings or orders that permit any state, much less a private party, to declare that an Indian tribe's consumer lending operations and its consensual contracts are illegal, let alone permit a state to interfere with their lending transactions. Instead, federal law permits national banks, FDIC-insured state-chartered banks and certain other classes of lenders (e.g., preferred ship-mortgage lenders), to make loans to residents of states without being subject to that resident state's usury laws.  Loans by Indian tribes as sovereigns represent another category of loans under the laws of the United States that may be made to residents of states without regard to state usury law.

87.     The Indian Commerce Clause "makes Indian relations … the exclusive province

---

[50] The Supreme Court has recognized the scope of Indian sovereignty as recently as this year (2023).   See: https://www.wsj.com/articles/supreme-court-rejects-tulsas-request-to-extend-authority-over-american-indians-d9e77c85.

[51] Not only is Plaintiff counsel's interpretation of: "rent-a-casino", "rent-a-billboard" and "rent-a-tribal-tax-credit" lawful, so are "rent-a-bank"; "rent-a-municipality"; "rent-a-Delaware-liability-protection-company", "rent-a-startup", and "rent-a-franchise".

of federal law"[52] and broadly preempts state laws that interfere with tribal activities and business enterprises.  Indeed, "the Indian Commerce Clause accomplishes a greater transfer of power from the States to the Federal Government than does the Interstate Commerce Clause" because although the "States still exercise some authority over interstate trade," they "**have been divested of virtually all authority over Indian commerce and Indian tribes**."[53]

88.     The Plaintiffs point out that the borrowers aren't physically located on the reservation and so LVD conduct has off-reservation elements, but that also is not relevant.[54]  The Supreme Court has made it clear that Indian tribes even retain some forms of civil jurisdiction over the conduct of non-Indians on non-Indian fee lands, including "the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana v. U. S.*, 450 U.S. 544, 565–66 (1981) (emphasis added).[55]

89.     The contract clause, found in Article I, section 10 of the Constitution, prohibits the states from impairing the obligations of contracts.  States have no power to generally restrict their citizens' freedom of contract or ability to shop for credit across jurisdictional boundaries.  Governments cannot generally substitute their judgments for those of their citizens.[56]

---

[52] *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 60 and 62, (1996) (quoting *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 234) (1985).

[53] *Id.* at 62 (emphasis added)

[54] Though it is no substitute for the Supreme Court precedent first established in *White Mountain Apache Tribe v. Bracker*, 448 U.S. (1980), under the Restatement (Second) of Contracts Section 187, the physical location of parties has no bearing on fundamental policy or a balancing test on the "materially greater interest" in the loan, and only a minor influence on a balancing test under Section 188.

[55] *Federal Trade Commission v Payday Financial, LLC*, 935 F. Supp. 2d 926, 940 (Dist. S.D. 2013) (finding both sides of a tribal loan transaction must be considered because "[r]educing the Montana jurisdictional analysis from a thorough investigation of the nonmember's course of conduct and contact with the reservation, to a mere determination of the **nonmember's physical location is improper** and would render Montana's jurisdictional inquiry inapplicable to many modern-day contracts involving a reservation-based business.") (emphasis in original). A contract dispute with a non-Indian may be subject to tribal jurisdiction, *Williams v. Lee*, 358 U.S. 217, 223, 79 S. Ct. 269, 3 L.Ed.2d 251 (1959), and a tribe has the authority to tax a non-Indian regarding business on a reservation.  *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 141, 102 S. Ct. 894, 71 L.Ed.2d 21 (1982).

[56] *See, e.g., Frisbie v. U.S.*, 157 U.S. 160 (1895) ("generally speaking, among the inalienable rights of the citizen is that of the liberty of contract"); *Allgeyer v. Louisiana*, 165 U.S. 578 (1897); *Lochner v. New York*, 198 U.S. 45 (1905); *Adair v. U.S.*, 208 U.S. 161(1908); *Coppage v. Kansas*, 236 U.S. 1 (1915); *Buchanan v. Warley*, 245 U.S. 60 (1917); *Ogden v. Saunders*, 25 U.S. 213 (1827); *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002).

90.     This well-established principle has been applied in the online tribal lending context, even when testing for jurisdiction over the *nonmember consumer* – let alone the arm of the Tribe lender.  After scouring federal Indian law in a well-written opinion, the District Court in South Dakota found that "[w]hen a nonmember enters into a commercial transaction with a tribal member or reservation-based tribal business, **receives a benefit coming from the reservation** as a result, and consents in a written contract to tribal jurisdiction, that nonmember has engaged in the sort of consensual relationship with the tribe or its members, through commercial dealing that would **subject the nonmember to tribal jurisdiction**".  *FTC v. Payday Fin., LLC,* 935 F. Supp. 2d 926, 936 (D.S.D. 2013) (emphasis added).  The inquiry pertained to the non-Indian's consensual conduct, *not* their geography.  Just as the non-Indian did not visit the reservation, nor does an Indian member/owner leave the reservation.   Nonetheless, the customer indeed consented to the receipt of a benefit coming from the reservation.  Tribal authority is not defeated even if it exerts some regulatory force on off-reservation activities and tribal regulation can even extend to non-Indian activities occurring off-reservation. Who has jurisdiction of *the lender* is a much easier question.

91.     The Supreme Court has consistently required courts to assess the applicability of state law through an interest-weighing analysis whenever it impacts on-reservation business[57] and "relied on the Indian Commerce Clause as a shield to protect Indian tribes from state and local interference."[58]  The time has come for one court, this Court (as the only one with jurisdiction over the Debtor, the tribal entities, and the Plaintiffs), to make a determination regarding whether the Indian Commerce Clause and the broad federal policy policies favoring tribal economic development and self-government preempt state usury laws.  Such a finding would allow the LVD tribe to continue its lending operations and result in the disallowance of the consumer Plaintiffs'

---

[57] *See, e.g., Ramah Navajo School Board,* 458 U.S. at 837; *Mescalero Apache Tribe,* 462 U.S. at 333; *Confederated Tribe of Colville Indian Reservation*, 447 U.S. at 155.

[58] *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 153-54 (1982).

claims.[59]  Federal case law and the evidence support the conclusion that the entirety of the LVD tribal lending operation is legal and that its arrangements with the Debtor, SPVI, and Martorello are not subject to state usury laws.

92.     The Plaintiffs have sued Martorello and others, who have indemnification claims against the Debtor which continue to escalate, to the detriment of the Debtor.  These Plaintiffs have been harassing the Debtor and others for six years with no end in sight.  Strong federal policy and the NABDA encourage tribal ecommerce under LVD law and the LVD tribal lending structure.  The Plaintiffs have no relevant facts or law to the contrary, and it is high time for this Court to put an end to the harassment, once and for all, and find that the Plaintiffs have no allowable claims against this Debtor, or anyone else, and allow the Debtor to successfully reorganize.

**THE VIRGINIA PLAINTIFFS' SETTLEMENT WITH LVD**

93.     The Plaintiffs pursued lawsuits in multiple forums to force the LVD tribe and the other defendants, including the Debtor, to spend so much on legal fees that they would surrender without ever being able to defend stigmatizing RICO claims.  Consequently, certain of the Plaintiffs (Virginia) forced an unwarranted settlement on the LVD tribe, and certain other defendants, not including Eventide and the non-settling defendants.  Ironically, this settlement took dollars from the allegedly illegal LVD tribe consumer lending business' ongoing operations and gave those dollars to the Plaintiffs.  Effectively, the Plaintiffs profess disgust with what they say is an illegal operation under Virginia law, but in the settlement, they continued the supposedly criminal enterprise in order to get a big piece of the proceeds of that very activity over the next

---

[59] Even if the Court were to disagree and find that state laws were not preempted by the Indian Commerce Clause, NABDA, and the strong federal policies favoring Indian tribal development, the Debtor contends that the Plaintiffs have no allowable claim based on the Debtor's good faith and advice of counsel defense to the Plaintiffs' alleged RICO claims.  Simply put, either the attorneys' positions were all correct and the Debtor has no downstream liability to the Tribe's borrowers – or they were all wrong and the Debtor has no downstream liability because it could never have known that it was violating state regulatory laws.

two years. In addition, the Plaintiffs also demanded and received a minority equity interest in what they allege is the center point of a criminal RICO enterprise, Eventide.

94. The positions of the Plaintiffs cannot be reconciled. They claim that the LVD consumer lending business is a criminal enterprise for which its benefactors are liable, but at the same time received approval from the Virginia court of a settlement that continued that very business, allegedly continuing to harm borrowers, but for the benefit of the Plaintiffs. Incredibly, the Virginia court ignored this blatant inconsistent position of the Plaintiff and granted approval of the settlement. Their theories that *the Debtor* cannot be a creditor to BPL without liability, but *they* can, cannot be reconciled. Their theories *Martorello* and others cannot be owners of the Debtor, but *they* can, cannot be reconciled. Either those roles create liability for unjust enrichment, usury law violations and RICO – or they do not. Plaintiffs position effectively constitutes a judicial admission by the Plaintiffs that the LVD tribal lending operations <u>are legal</u> and they should not be permitted to sustain their claims.

## **<u>THE NEW NOTE</u>**

95. As noted above, the dispute between the Plaintiffs and Martorello relating to the legality of the LVD lending operations has spilled over and is now affecting the Debtor's loan agreement with the LVD tribe. Specifically, LVD has cut off payments to the Debtor under the New Note, a secured note, based on an alleged *force majeure* arising from the recent adverse ruling against Martorello in the *Williams* litigation. Although the LVD tribal entities indeed insist that their lending operations do not violate state law, and they are in fact to date continuing their tribal lending operations (and their loan payments to numerous *other* third-party creditors) just as they had before the *Williams* ruling, they contend that the adverse ruling against Martorello conveniently renders their obligations to make payments to the Debtor, illegal. Their self-serving and curiously timed facetious position, of course would allow them to keep the business that they purchased, and yet skirt the entirety of their remaining obligations to the tune of $27 million.

96. Nonetheless, no adverse judgment has ever been rendered against the Debtor

and there certainly has never been a finding by any court that the LVD tribal entities' obligations under the note or loan documents are illegal or unenforceable for any reason.

97.     Consequently, the Debtor disputes LVD's position, has declared a default under the New Note and LSA based on the LVD tribal entities' failure to make the payment when due in September, has accelerated all payment obligations thereunder, and intends to exercise its rights under the New Note and LSA through this bankruptcy case.

98.     A determination that the LVD tribal lending operations are illegal and/or a finding that the New Note is illegal may vindicate the Plaintiffs' position regarding tribal lending, but it would most certainly destroy the Debtor's ability to pay legitimate creditors in this case.  The Plaintiffs cannot credibly assert that Eventide has any liability for the seller financing of a business, but then demand the New Note as its reparations.  As a result, the Debtor maintains that having all of the parties in the same forum is the only way for a global resolution to be reached and/or for a final determination of these issues to be made.  However, until all of these issues have been resolved (i.e., the legality of the LVD lending operations, the indemnity claims against the Debtor, and the Debtor's rights under the New Note), Eventide cannot finance protracted litigation in multiple forums and needs the protection of chapter 11 to resolve the myriad of interrelated disputes discussed herein.

### THE PRIOR CHAPTER 11 AND *WILLIAMS* RULING

99.     Eventide filed a prior Chapter 11 case in this Court, which was dismissed, principally because the Bankruptcy Judge concluded that Eventide had the resources adequate to defend itself in suits in Virginia, Massachusetts, and Oregon.  Although Eventide disagreed with that ruling, those resources no longer exist.[60]  In addition, LVD has informed Eventide that it will no longer make payments on the New Note.  Two new usury suits were filed in Indiana and

---

[60] Unlike in the 2020 bankruptcy, where the Debtor was able to obtain secured financing, with a new ruling in *Williams* concluding that any party associated with the tribe's lending operation will be held liable for treble damages under RICO's collection of an unlawful debt, without regard to their good faith intentions, there are obviously no financing alternatives available to this Debtor.

Illinois and, although they were dismissed on the Petition Date, they demonstrate that, absent bankruptcy protection, additional suits will likely be filed against the Debtor on a state-by-state basis. Further, although the Plaintiffs in one of the cases had hoped to create a least large multistate class through their existing lawsuits, their efforts were rejected by the Virginia district court.[61] As a result, the Bankruptcy Court is the only forum in which consumer Plaintiffs across the country can be on a level playing field to assert their claims against the Debtor.

100.    The District Judge in *Williams* recently ruled that Martorello, who is indemnified by the Debtor, is liable for $43 million. The Debtor and Martorello completely disagree with that decision and Martorello will appeal that ruling.

101.    However, the fact is that the Debtor is under an overwhelming onslaught of litigation and its sole source of cash flow cannot be leveraged and is wrongfully being withheld by LVD. The Tribe contends that the *Williams* ruling constituted a *force majeure* justifying a future termination of its obligations under the New Note on November 1, 2023. The Tribe is in monetary default and the *Williams* ruling has no bearing on the independent obligations of the Tribe to pay for the business it purchased. The New Note was not terminated, its remedies for non-payment remain valid, effective, and enforceable, and the ruling does nothing to prohibit Eventide from enforcing its rights under the New Note and LSA. Although arbitration of this dispute has very recently been commenced, the entire panel of arbitrators has not yet even been chosen and the resolution of LVD's liability under the New Note is critical to the Debtor's bankruptcy case. A swift resolution of this dispute by this Court is imperative, since without collection of the New Note, and the determination in a collective manner of the legitimate claims against the Debtor, resolution of the multiple suits against the Debtor will be impossible.

---

[61] See *Galloway v. Martorello,* Civil Action No. 3:19-cv-314, pending in the United States District Court for the Eastern District of Virginia, ECF No. 371 entered Sept. 23, 2021 (memorandum order determining that state law claims under thirteen different state laws based on conduct that also relates to alleged violations of RICO "are not appropriate for class action treatment" and dismissing claims asserted under state laws other than Virgina state laws).

## CONCLUSION

102.    As described above, the multiple lawsuits and the payments under the New Note arise out of the same material facts and rely on related legal principles.  Piecemeal litigation will result in imminent destruction of the Debtor to the detriment of its creditors and other parties in interest.

Dated: September 15, 2023

**FORSHEY & PROSTOK, LLP**

*/s/ Jeff P. Prostok*
Jeff Prostok
State Bar No. 16352500
Suzanne K. Rosen
State Bar No. 00798518
777 Main Street, Suite 1550
Fort Worth, TX 76012
Tel: 817-877-8855
Fax: 817-877-4151
Email:   jprostok@forsheyprostok.com
            srosen@forsheyprostok.com

*Proposed Counsel for the Debtor*
*Eventide Credit Acquisitions, LLC*

-AND-

**PHELANLAW**

*/s/ Robin Phelan*
Robin Phelan
State Bar No. 15903000
4214 Woodfin Drive
Dallas, Texas  75220
Tel:  214-704-0222
Email:  robin@phelanlaw.org

*Proposed Special Counsel for the Debtor*
*Eventide Credit Acquisitions, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 15, 2023, a true and correct copy of the foregoing document was served upon all parties that are registered to receive electronic service through the court's CM/ECF notice system in the above case and upon the parties reflected below as indicted below:

*Via Email:* courtecl@edcombs.com
*And Via First Class Mail, Postage Prepaid:*
Daniel A Edelman
Edelman Combs Latturner & Goodwin LLC
20 S Clark St
Suite 1500
Chicago, IL 60603

*Via Email:* lenbennett@clalegal.com
*And Via First Class Mail, Postage Prepaid:*
Leonard Anthony Bennett
Consumer Litigation Associates
763 J Clyde Morris Boulevard, Ste 1A
Newport News, VA 23601

*Via Email:* mac@caddellchapman.com
*And Via First Class Mail, Postage Prepaid:*
Michael A. Caddell
Caddell & Chapman
628 East 9th Street
Houston TX 77007

*Via Email:* kkelly@kellyguzzo.com
*And Via First Class Mail, Postage Prepaid:*
Kristi Cahoon Kelly
Kelly Guzzo PLC
3925 Chain Bridge Road
Suite 202
Fairfax, VA 22030

*Via Email:*
toby.gerber@nortonrosefulbright.com
*Via Email:*
Steve.peirce@nortonrosefulbright.com
Toby L. Gerber
Steve A. Peirce
Norton Rose Fulbright US LLP
2200 Ross Ave., Suite 3600
Dallas, TX 75201

*Via Email:* tgibbs@rosettelaw.com
*Via Email:* jgray@rosettelaw.com
Tanya Gibbs
Justin Gray
Rosette LLP
44 Cesar E. Chavez Avenue SW, Suite 250
Grand Rapids, MI  49503

*Via Email:* Elizabeth.A.Young@usdoj.gov
Elizabeth A. Young
Trial Attorney, Office of the U.S. Trustee
1100 Commerce Street, Room 976
Dallas, TX 75242

*/s/ Jeff P. Prostok*
Jeff P. Prostok

# EXHIBIT "A"

| Date | Source | Description | Bates # |
|------|--------|-------------|---------|
| **GREENBERG TRAURIG ("GT") ESTABLISHED A LAWFUL ONLINE TRIBAL LENDING OPERATION – THE SERVICING CONTRACT IS THE LEGAL ADVICE RELIED UPON** | | | |
| October 2011 | GT Law | **GT'S Jennifer Weddle Engaged**: Affidavit and Testimony detailing the depth of Ms. Weddle's legal and professorial experience in tribal lending and related Indian law (*i.e.* **Ms. Weddle has "worked on virtually every Native American matter before the U.S. Supreme Court since 2001"**), and the breadth of GT legal coverage upon which Martorello relied. | Weddle 12/13/18 Aff at ¶2, 3, 4, 6, 11, 13, 14, 15; *See also* Weddle 5/20/19 Depo Exhibit 1; *see also* Weddle Dep. May 20, 2019 at 30:20-32:15; 34:25-38:17 |
| October 2011 | GT Law | **Ms. Weddle Testified**: "**Several dozen different attorneys at GT** worked on matters for Bellicose over the years" including <u>former the US Attorney of Colorado, AUSA, Deputy Attorney General, Appellate Chief for the Southern District of New York</u>, several AUSAs from that district, and many others.  <u>Martorello engaged former regional director of the FTC at GT law to audit Red Rock Tribal Lending, LLC's ("RRTL")'s consumer facing documents.</u> | Weddle Dep. May 20, 2019 at 211:10-212:14; 26:15-29:2; 121:25-123:25 |
| Attorney J. Weddle Deposition | GT Law | **Ms. Weddle Testified**:  "… <u>does the tribe have the sovereign ability to be in the business, and was Mr. Martorello lawfully providing services pursuant to a contract?</u> Under the documents that Greenberg Traurig was involved in, **yes, that was absolutely the case**." | Weddle Dep. Feb 15, 2023 at 86:4-9. |
| November 11, 2011 | GT Law | Weddle issues to Martorello and tribal representatives an **RRTL GT "Closing Checklist" on GT letterhead**, which she describes as "to-do lists in anticipation of the start of operations in a few weeks" tracking the "many moving parts of these deals".  The Check list allocates **"GT" as "responsible party"** <u>to numerous contracts, agreements and consumer facing RRTL documents and disclosures</u> and includes vendor setup to both RRTL and Martorello's company. | Rosette_Revised_0 02168; Rosette_Revised_0 02169 |

| October 25, 2011 and July 31, 2012 | GT Law and Rosette | **The Legal Advice that Martorello Relied on is "GT Servicing Agreement"**: "Tribe and Enterprise have been represented by Rosette, LLP… **Servicer has been represented by Greenberg Traurig LLP**…" and "each and every law of the Tribe or otherwise that may pertain to the transactions and activities contemplated" are set forth in Schedule 1.0, "**there are no laws, requirements or restrictions that are reasonably known to the Parties… that could apply to such transactions…including but [not] limited to laws, requirements or restrictions related to civil or criminal usury**". | Servicing Agreement ¶26 and ¶7.7; *See also* Weddle Dep. May 20, 2019 at 117:11-119:13 (the Servicing Agreement was modeled after the National Indian Gaming Commission template) |
| Attorney J. Weddle Deposition | GT Law | **Ms. Weddle Testified**:  confirming the extent of representation upon which Martorello relied, to include the structure between his company, Bellicose, and the tribal entities and numerous services GT provided to the tribe to establish the lending code, structure, the consumer facing documents and various contracts and agreements and states that such is "a common model in Indian country for how tribes can develop businesses that they don't have previous experience in."  She does not recall ever having been made aware of any breach of GT's servicing agreement, by either side. | Weddle Dep. Feb 15, 2023 at 17:17-18:6 and 18:11-17. See also *Id.* at: 20:10 – 22; 21:14-19; 23:25-25:6; 37:4-19; and 43:24-44:5. |
| Attorney J. Weddle Deposition | GT Law | **Ms. Weddle Testified**:  "… all of the consumer documents [GT] drafted in 2011 or 2012 were certainly drafted to **absolute platinum standard at the time**". | Weddle Dep. Feb 15, 2023 at 91:9-13. |
| Attorney J. Weddle Deposition | GT Law | **Ms. Weddle Testified**:  "There's no reason to think that ancillary service providers would be subject to litigation related to a loan made by a whole other entity." | Weddle Dep. Feb 15, 2023 at 92:5-8. |
| Attorney J. Weddle Deposition | GT Law | **Ms. Weddle Testified**:  She thinks it is accurate that "the vast majority of the documents, the materials in that closing checklist were the responsibility of Greenberg Traurig", **GT is characterized as "the actual architect"** of the tribal lending operation. | Weddle Dep. Feb 15, 2023 at 74:20 – 75:9. |

| 2012 – 2013 | GT Law | **Ms. Weddle Refutes State AGs** – Ms. Weddle also advised Martorello regarding (alongside Indian law attorney Wichtman) **responses refuting to dozens of state agency** letters affirming "**the inapplicability" of state laws**, that "**Oklahoma law has no bearing on his loan**" that the lenders were "not subject to state regulation", "**state law does not apply**", "the loan agreement… is governed by the laws of the [tribe]" and lender "operates pursuant to, Tribal law" and "is fully regulated by the Tribal Regulatory Authority".  Her advice included suggestions to deny refunds relating to underlying complaints given **tribal lenders have "done nothing wrong"** and **some states "might need more education about tribal sovereignty"**.  Martorello is copied on all such correspondence.  Ms. Weddle has testified to her involvement in the correspondence and that she discussed various communications from state regulatory authorities with Martorello. | Rosette_Revised_0 34956; 002676 and 002679; 003210; 003758 and 003763; 005605, 005636 and 007510; 004283 and 004287; 004292 and 004303; 010047; 038154; 007325 and 007329; 007259; 006782; 002410; 003753, 007220 and 003756; 005301 and 005310; Weddle Dep. Feb 15, 2023 at 44:9-25; Weddle Dep. May 20, 2019 at 164:13-173:5 |
| Attorney J. Weddle Deposition | GT Law | **Testified**:  Weddle confirms that "in [her] representation of th[e]se nontribal entities in the tribal lending business, **[it was her] job to advise [Martorello] how to provide services and have involvement in [the] tribal lending business such that they will not have legal exposure or liability to claims for millions of dollars**" and "all clients want to understand that the services they're providing to tribal business or any **businesses are lawful and appropriate**" and that **none of Martorello's cases through February 2023 "impact the underlying sovereignty basis for the business.**  And the litigation theories being put forward by plaintiffs in those cases expressly contradict well-settled federal Indian law and the great weight of policy by the federal government and tribes' engagement with the federal government." | Weddle Dep. Feb 15, 2023 at 87:12 – 89:4. |
| Attorney J. Weddle Deposition | GT Law | **Testified**:  Weddle testified that she "is aware that more than 40 states have usury laws" and *rejects* that "the advice she gives her clients is that the tribe is not bound by [state usury law], not because the conduct is [legal] but because the | Weddle Dep. Feb 15, 2023 at 67:21 – 69:5. |

| | | tribe has immunity and cannot be sued for breach of those laws". Instead, **Ms. Weddle details (consistent with her legal opinions shared with Martorello herein) how the constitutional predicate and inherent tribal sovereignty which "<u>Congress has never acted to limit [] in the consumer lending space</u>" leaves "<u>tribes [] free, just as states, to regulate [that] commerce, and they do</u>**". | |
|---|---|---|---|
| **CONNER AND WINTERS AND ROSETTE LAW ESTABLISHED THE EVENTIDE SALE AND FINANCING DOCUMENTS – THE DOCUMENTS ARE THE LEGAL ADVICE RELIED UPON** | | | |
| August 18, 2014 | Conner and Winters and Rosette Law | Four Rosette lawyers email Martorello optional structures.  Once the terms of a sale had progressed, **<u>Martorello retained counsel with expertise in such transactions, an Indian law attorney (at Conner and Winters, LLP) and adjunct professor of Indian law (Mr. John Williams), who has testified that he drafted the documents relating to the sale of Bellicose to the Tribe</u>**.<br><br>**<u>The parties do not dispute that the sale-model was "designed by the Rosette law firm", not Martorello, and used by "several other tribal lending enterprises" both before (including one in which Mr. Williams, like here, represented the seller) and after the 2016 sale</u>**. See Hengle v. Asner, No. 3:19-cv-00250-DJN (E.D. Va. Apr. 21, 2022) [Dkt. No. 184-1] (Plaintiffs' counsel referring to the sale model as having been developed by Rosette LLP). | Rosette_Revised_0 52619; ECF 1255 Ex. UUU (Williams CV); J. Williams Dep. 6.22.20 at 20:10-21:11; 58:20-61:4; 116:17-117:2; 120:25-123:14; 126:1-9; 146:3-149:21. |
| Attorney and Adj Professor of Indian Law - J. Williams - Deposition | Conner and Winters - Eventide Sale Transaction | **C&W - the Eventide Loan and Security Agreement**: <u>Mr. Williams drafted the 2016 sale documents based upon his opinions that state laws do not apply to tribal lending entities</u>, that tribal governments should not become involved with day-to-day business decisions, his understanding that Ascension Technologies, LLC's operating agreement limited the roles of Hazen and Chairman Williams in their capacity as LLC managers, and that he recommended Ascension's delegation of authority to McFadden | J. Williams Dep. 6.22.20 at 20:10-21:11; 58:20-61:4; 116:17-117:2; 120:25-123:14 126:1-9: 146:3-149:21 |

| | | | |
|---|---|---|---|
| | | as Ascension's President and CEO, and he disagrees that the sale was a sham. | |
| January 26, 2016 | Rosette Law | **ROSETTE LAW OPINES ON LEGALITY OF EVENTIDE'S CONTRACTS** – Issued to Eventide, produced by Martorello, <u>analyzing 25 legal documents and contracts (including delegations of authority and Servicing Agreement) and opining that all of Eventide's covenants are legal and enforceable and that BPL's loans are valid and enforceable.</u> | Martorello_009950 |
| **NUMEROUS ATTORNEYS MARTORELLO RELIED ON WERE DEEPLY ENTRENTCHED IN THE OPERATION, ALL OF WHOM TESTIFIED IN RELATION TO THE PARTIES' LAWFUL INTENT** | | | |
| Attorney D. Gravel Deposition | Bellicose - In-house general counsel | **Testified**: That Gravel and **Martorello's advice of counsel received had led Martorello to believe the conduct was entirely lawful.  They had received legal advice to that affect from many different attorneys, including GT, which never faltered,** including during and after the *Otoe-Missouria* litigation and in the face of regulatory attacks on RRTL.  At no time did Gravel believe or receive any suggestion from anyone that LVD or Martorello's companies were engaged in anything illegal.  <u>Nor did Martorello ever say anything, or do anything, that suggested to Gravel that Martorello believed tribal law did not apply.</u> | Gravel Dep. April 5, 2019, 71:12-72:22; 75:18-76:15; 77:13-78:3; 82:9-18; 85:20-86:11; 88:5-15; 95:20-96:6; 96:17-100:6; 136:1-137:19; 152:1-18; 153:10-154:18; 161:2-19 |
| Regulatory Attorney J. Galloway - Deposition | Jennifer Galloway PA – outside compliance counsel | **Testified**: Ms. Galloway worked with several folks at Bellicose to create a compliance management system ("CMS") and her extensive independent due diligence from her annual audits of RRTL and Martorello's company (which were received by Martorello) revealed that they "were not a fraud", she knows that "all loans were reached on tribal land.", that **they were in compliance with their respective CMS and policies and with tribal and federal consumer financial laws, and that they took that compliance with the law seriously**. | J. Galloway Dep. July 13, 2020 at: 25:5- 38:16; 43:16-45:1; 51:7-22; 60:8-64:21; 67:13-68:19; 74:12-20 |

| Attorney R. Rosette | Rosette Law – LVD outside counsel | **Testified**: The *Otoe-Missouria* final outcome validated the legal premise of RRTL under *Cabazon,* and that **he shared that opinion with Martorello**. Rosette met with the CFPB and state governments on behalf of LVD's lending, and Martorello encouraged him and LVD to educate and work with the federal and state regulators about the legal predicate for tribal lending. | R. Rosette Dep. June 29, 2020 at: 65:6-66:13; 137:3-143:2; *See also* https://turtletalk.blog/2014/10/01/rosette-firm-on-the-second-circuits-decision-in-otoe-missouria-tribe/ |
|---|---|---|---|
| Attorney K. Wichtman | RRTL and BPL's external general counsel | **Testified**: Ms Wichtman, who testified that she visited the tribal lending offices between 100 and 500 times over five years, affirmed that she always maintained her opinion that RRTL and Martorello's conduct were lawful and had extensive conversations about it with Ms. Weddle and with Martorello. That **Martorello did not believe LVD lending was illegal** after the *Otoe-Missouria* ruling, rather "he was very pleased with the outcome". She validated the accuracy of numerous legal opinions that she authored and **shared with Martorello**. | K. Wichtman Dep. July 14, 2020 at 48:2-51:8; 59:3-63:1; 86:25-87:17; 90:17-24; 152:7-173:18 |
| **JENNIFER WEDDLE'S TESTIMONY AS TO THE LAWFUL INTENT AND LEGALITY OF THE OPERATION** | | | |
| Attorney J. Weddle Deposition | GT Law | **Testified**: Addressing GT providing RRTL's documents and stating: "**the whole point of the deal was to allow [LVD] to establish loans pursuant to its tribal laws… and where state laws would not be applicable**" and that was her understanding at the outset of the transaction, which never changed through January of 2016 [sale]. | Weddle Dep May 20, 2019 at 57:18-63:22 |
| Attorney J. Weddle Deposition | GT Law | **Testified**: her view **in 2011, 2014, 2016 and still today remains that "states ha[ve] no authority to regulate tribal lending"** and, aware of what RRTL consumer loan documents say, **she would not have been involved in the transaction were they to be illegal loans**. | Weddle Dep May 20, 2019 at 66:4-69:6 |
| Attorney J. Weddle Deposition | GT Law | **Testified**: Her belief that **the economics between LVD and Martorello's company caused her no concern, were "standard" and "not uncommon"**, "there was no restriction in 2011 | Weddle Dep May 20, 2019 at 103:1- |

| | | and there is no restriction today" and "tribes as governments are free to retain whatever services they desire on terms that are acceptable to them. **There is no indicia of the amount of moneys or the degree of success of a tribal business that somehow influences its tribalness**". | 104:3 and 105:4-10 |
|---|---|---|---|
| Attorney J. Weddle Deposition | GT Law | **Testified**:  At all instances from inception to time of the sale, in her witness, LVD was controlling RRTL.  **At no point was Mr. Martorello, or any entity he was ever involved in, controlling anything." The "Tribal nature of the entities was never in doubt."** | Weddle Dep. May 20, 2019 at 105:25-112:8 |
| Attorney J. Weddle Deposition | GT Law | **Testified**:  <u>Martorello engaged former regional director of the FTC at GT law to audit RRTL's consumer facing documents</u> and no concerns from anyone at GT arose regarding compliance with federal law. | Weddle Dep. May 20, 2019 at 121:25-123:25 |
| Attorney J. Weddle Deposition | GT Law | **Testified**:  The *Otoe-Missouria* decision did not impact **her "belief that tribal law applied to the consumer contracts between [RRTL] and consumers"** | Weddle Dep. May 20, 2019 at 126:21-129:15 |
| Attorney J. Weddle Deposition | GT Law | **Testified**:  GT August 19, 2013 legal opinion applies to RRTL, discussing the opinion and the **more than a dozen GT lawyers involved** in it, and she agrees still today with everything in the letter. | Weddle Dep. May 20, 2019 at 130:3-139:7 |
| Attorney J. Weddle Deposition | GT Law | **Testified**:  Regarding Nov 30, 2012 GT law legal opinion issued about RRTL | Weddle Dep. May 20, 2019 at 139:23-141:21 |
| Attorney J. Weddle Deposition | GT Law | **Testified**:  How and why adverse rulings in cases involving Western Sky never "caused [her] to question [her] belief – that **tribal law applied to the consumer lending contracts between [RRTL] and consumers**. | Weddle Dep. May 20, 2019 at 143:21-148:15 |
| Attorney J. Weddle Deposition | GT Law | **Testified**:  Weddle **never believed (and still does not believe) there was anything unlawful about RRTL.** | Weddle Dep. May 20, 2019 at 149:2-150:25 |

| Attorney J. Weddle Deposition | GT Law | **Testified**:  Re: the district court ruling in *Otoe-Missouria* "**no one's understanding of the legality of lending had changed**". | Weddle Dep. May 20, 2019 at 156:11-12 |
|---|---|---|---|
| Attorney J. Weddle Deposition | GT Law | **Testified**:  Weddle participated in responding for RRTL to various communications from state regulatory authorities and shared those comments and drafts with her client, Martorello. | Weddle Dep. May 20, 2019 at 164:13-173:5 |
| Attorney J. Weddle Deposition | GT Law | **Testified**:  Weddle never believed RRTL was owned or controlled by Martorello or his company. | Weddle Dep. May 20, 2019 at 105:25-112:8 |
| Attorney J. Weddle Deposition | GT Law | **Testified**:  Weddle co-authored the National Congress of American Indians ("NCAI") Amicus brief in November of 2017 i.e. "**there is no applicable state law here**", it accurately represents her beliefs (and that of the NCAI) with respect to tribal sovereignty in tribally made loans, and "is the most accurate legal advice that we provided to the [NCAI]" | Weddle Dep. May 20, 2019 at 178:24-180:23 |
| Attorney J. Weddle Deposition | GT Law | **Testified**:  Explaining that the **cases involving Cash Call, Western Sky and Hallinan have not altered her opinion about the lawfulness of RRTL's loans.** | Weddle Dep. May 20, 2019 at 180:24-184:10 |
| Attorney J. Weddle Deposition | GT Law | **Testified**:  Weddle testified that **the <u>various regulatory efforts, enforcement noise, operation chokepoint, and litigations (i.e. Western Sky, Cash Call, Otoe-Missouria vs NY DFS) never caused her to believe that the LVD tribal lending entities (nor Bellicose and SourcePoint) were doing anything illegal</u>**, and she has maintained that belief to date. | Weddle Dep. May 20, 2019 at 202:2-19 |
| **THE LEGAL OPINIONS ADRESSING THIS OPERATION AND THE GOVERNMENTAL SUPPORT FOR ONLINE TRIBAL LENDING** | | | |
| November 16, 2012 | GT Law | **GT LEGAL OPINION**: GT discussing RRTL's 3rd party consumer loan capital provider and related licensing matters, issuing legal opinion, including that the "Consumer Loans made by Borrower pursuant to the Consumer Loan Documents are enforceable **under the Tribe's laws**"; negotiating promissory note and loan and | Rosette_Revised_0 00768; 770; 1060; 1066; 001104 |

| | | security agreement.  Martorello is copied on all correspondence. | |
|---|---|---|---|
| November 30, 2012 | GT Law | **Two GT Legal Opinions** - Reviewing all documents and contracts relating to RRTL and LVD and opining that RRTL's loans "are enforceable **under the Tribe's Laws**" and the 3rd party creditor's covenants are valid, enforceable and consistent with applicable tribal and federal laws.  Produced by Martorello. | Martorello_012696; Rosette_Revised_001029; 3832; 3836 |
| December 2, 2012 | GT Law | **GT LEGAL OPINION**: GT law helps close RRTL's debt for consumer loan capital with the 3rd party hedge fund, Alpha Credit.  Includes signature pages for SPVI, Iron Fence, Matt and his wife Rebecca (for purpose of any joint property only).  Also includes Indian Law opinion, since authenticated by Ms. Weddle, that **the loans are enforceable under Tribal Law**.  Also includes deposit account control agreement for 3rd party lender. | Rosette_Revised_000128; 129; 139; see also Weddle Dep. Feb 15, 2023 at 27:21-29:14. |
| August 8, 2013 | GT Law | **GT LEGAL OPINION**: Email correspondence where Weddle shares with Martorello and others that GT spoke to NY DFS and their legal position was hinged on the Western Sky cases, which she says "have nothing to do with SOVEREIGN enterprises", and that **NY is not correct that "lenders' acts of putting money in and out of New York bank accounts puts lenders within the purview of New York consumer laws**", noting an "impermissible restriction on interstate commerce". | Rosette_Revised_010279 |
| August 8, 2013 | GT Law | **GT LEGAL OPINION**: Weddle suggests consultative and educational approach about the legal predicate, rather than attacking NY DFS and filing suit.  Martorello suggested major press releases across the country spelling out "why tribal lending is legal" and asks Ms. Weddle to write a letter to review them together. | Rosette_Revised_010299 |
| August 18, 2013 | GT Law | **GT LEGAL OPINION** - Email from Jennifer Weddle to Martorello and others, referring to an attached legal opinion authored by co-head of GT's Indian law department and former US | ROSETTE_REVISED_002801; 2802; and 002819 |

| | | Attorney for the state of Colorado, Troy Eid, stating "**the same law applies and our views are identical with respect to LVD's operations**". Martorello states that he is aware the lawyers authored opinions for their other clients.   GT's attached opinion canvasses federal Indian law to detail for the State of NY why NY DFS is wrong, in that state law does not apply to tribal online lending. | |
|---|---|---|---|
| August 22, 2013 | GT Law | **GT LEGAL OPINION** – Weddle drafts a legal opinion about RRTL, sent to Martorello, which canvasses federal Indian law to state "**there is no applicable state law here**". | Rosette_Revised_0 04276 and 4277 |
| September 5, 2013 | FDIC | **FDIC Authorizes Banking RRTL** - LVD's Bank's ("CVB") CEO, Mr. Gerber, informs Martorello that **the FDIC had informed him that "TLE[]s [Tribal Lending Entities] are not illegal**" and so CVB may continue banking for RRTL, and his meeting resulted in the FDIC issuing its first financial institutions letter related to Tribal lending entities.  Mr. Gerber joined the Chairman in walking the CFPB through the tribal code, laws and regulations around their lending. | Gerber Dep. 12/17/18 at 108:4-17; 75:20-80:14; Dep EX. 16; Williams Dep. 7/1/19 at 21:1-23:2 |
| October 13, 2013 | National Congress of American Indians ("NCAI") | **Resolution in Support** - announcing that "NCAI supports member tribes offering online short term consumer financial products and services, which are authorized under tribal law, consistent with federal consumer protection laws as well as relevant Congressional directives" and explaining how **"Congress expressly recognized the authority of tribal governments to conduct and regulate short-term online consumer financial services"** | LVRMM_000795 90; https://www.ncai.o rg/resolutions/TUL -13-056_for_review.pd f |
| November 22, 2013 | State of California | **CA supports RRTL** - Martorello is informed via email of conversations with California's highest governmental officials in support for recognizing tribal lending's legality.  **Head of California's Department of Business Oversight had offered to personally up to two call banks and payment processors for RRTL to "provide them with assurances that she to inform them that she believes the sovereign model is legitimate** and that an MOU is being worked out | Rosette_Revised_0 52243, and 044365 |

| | | so as to not dispute processing.".  He is informed, that she had stated, "<u>California is certainly not New York, and New York has absolutely no understanding of tribal sovereignty</u>". | |
|---|---|---|---|
| January 10, 2014 | Rosette Law | Opinion letter from Wichtman setting forth basis for the position that Duck Creek Tribal Financial, LLC "is properly authorized under Tribal law to provide short term consumer finance products to consumers". Ms. Wichtman validated the accuracy of numerous legal opinions that she authored and **shared with Martorello**. | Wichtman Ex. 12; Wichtman Dep. July 14, 2020 at 152:7-173:18 |
| January 22, 2014 | Rosette Law | Opinion letter from Wichtman regarding the Tribal Dispute Resolution mechanism and the operations of RRTL. Ms. Wichtman validated the accuracy of numerous legal opinions that she authored and **shared with Martorello**. | Wichtman Ex. 13; Wichtman Dep. July 14, 2020 at 152:7-173:18 |
| January 22, 2014 | Rosette Law | Memorandum from Rosette LLP summarizing *People v. MNE* (California Court of Appeal, January 21, 2014). Ms. Wichtman validated the accuracy of numerous legal opinions that she authored and **shared with Martorello**. | Wichtman Ex. 14; Wichtman Dep. July 14, 2020 at 152:7-173:18 |
| January 24, 2014 | Dechert LLP | Letter from David Bernick to the Second Circuit regarding the *People v. MNE* decision, stating the court in that case "acknowledged the tribal sovereign right to conduct business with third parties and held that these relationships in no way diminish the sovereign character of the business activities." | LVD-DEF00006121 |
| April, 24 2014 | GT Law | **GT LEGAL OPINION** – Weddle publicly authors and <u>emails "Nothing Nefarious" to Martorello</u>.  Published in The Federal Lawyer canvassing federal Indian law and **detailing the legal predicate for why state law does not apply to online tribal lenders**. | Rosette_Revised_0 42100 and Martorello_012230 |
| May 9, 2014 | Rosette Law | **Rosette Legal Opinion** – Martorello receives a legal opinion via email, authored by Ms. Wichtman, concluding "RRTL is a Tribally-owned and operated lending company and legal enterprise governed by Tribal laws, regulated by Tribal officials, and overseen by Tribal leadership…." And "<u>Unless and until Congress</u> | Rosette_Revised_0 47173 and Rosette_Revised_0 47176 |

| | | explicitly abrogates tribal sovereignty in the arena of short-term online lending, loans made by Indian tribes within their sovereign powers and pursuant to tribal authority, procedures and regulations should be deemed lawful." | |
|---|---|---|---|
| June 5, 2014 | CFPB | **Federal Govt Support** – Martorello is informed that **RRTL is registering with CFPB to co-regulate** consumer complaints.  CFPB and NCAI hold meetings in 2014.  CFPB issues public guidance, consultation and support educating Tribal regulators how to supervise their online tribal lending operations, and CFPB Director's meet with **LVD Chairman Williams at CFPB headquarters on a government to government basis, numerous times**. | Rosette_Revised_0 30630, 052280, 000977 and https://www.consumerfinance.gov/tribal/; Williams Dep. 7/1/19 at 21:1-23:2 |
| August 25, 2014 | State of New Mexico | **LVD and State of New Mexico MOU** – Martorello is informed via email that the New Mexico Attorney General "is committed to Tribal online lending" and entered a MOU with another tribe, and would later do so with LVD, for co-regulation.  He supports Tribe's rights to engage in online lending, similar conversations with other states would ensue. | Williams Dep. 7/1/19 at 103:7-104:2; Rosette_Revised_0 52397 |
| October 1, 2014 | Rosette Law | **Rosette Legal Opinion** – Publicly and directly addressing Second Circuit *Otoe-Missouria* outcome as "a clear victory" for RRTL as it demonstrates *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987) controls, rather than adopting the erroneous application of the Restatement of Contracts as the lower court had. | https://turtletalk.blog/2014/10/01/rosette-firm-on-the-second-circuits-decision-in-otoe-missouria-tribe/ |
| October 1, 2014 | Dechert LLP | **Statement by RRTL Litigation Counsel** – Martorello is informed that David Bernick - LVD's 2nd Circuit lead counsel in the *Otoe-Missouria* litigation states that "it is a win" but has points he disagrees with.  Martorello responds he "thought this was an excellent result". | ROSETTE_REVISED_053383 |
| November 3, 2014 | Rosette Law | Letter from Wichtman "summarizing the basis for our position that RRTL is properly authorized under applicable tribal law to provide short term consumer finance products to consumers". Ms. Wichtman validated the accuracy of numerous | Wichtman Ex. 15; K. Wichtman Dep. July 14, 2020 at 152:7-173:18 |

| | | legal opinions that she authored and **shared with Martorello**. | |
|---|---|---|---|
| December 25, 2014 | Conner & Winters | Email from Martorello to Indian law attorney John Williams, who did the Eventide transaction, seeking advice regarding a letter received by the Tribe's lending entities from the Colorado Attorney General. | Williams Ex. 24 |
| April 2015 | GT Law | **GT Legal Opinion** - Weddle authors "Suffer no Tyranny" - Published in the Federal Lawyer detailing differences in tribal vs state policy choices and stating "Internet consumer lending" is an "area[] where state law has no force or effect on tribal entities" and "Congress has not acted to vest states with power over tribes [in the area of Internet consumer lending]. **Instead, Congress has done the opposite**…" Produced by Martorello. | Martorello_012237 |
| April 20, 2015 | Rosette Law | **Rosette Legal Strategy Overview** – Martorello receives an email detailing positive progress in various Federal and State co-regulation efforts, MOUs, and other inter-governmental advocacy strategy. | Rosette_Revised_ 002416 and 2420 |
| May 13, 2015 | GT Law | **GT/CFPB** - Weddle and Martorello involved in assisting the tribal Chairman's written submission on behalf of its lending entity to the CFPB's SBREFA Panel for potential rulemaking, also discussing related educational strategy sessions and public relations. | Rosette_Revised_0 04497; 000971; 000977; 005671; 5857; |
| November, 2015 | FDIC | **FDIC Guidance** – FDIC issues "**Guidelines for Payday Lending**" which states that "Federal law authorizes federal and state-chartered insured depository institutions making loans to out of state borrowers to 'export' favorable interest rates provided under the laws of the state where the bank is located. **That is, a state-chartered bank is allowed to charge interest on loans to out of state borrowers at rates authorized by the state where the bank is located, regardless of usury limitations imposed by the state laws of the borrower's residence**. Nevertheless, institutions face increased reputation risks when they enter into certain arrangements with payday | https://www.fdic.g ov/news/inactive-financial-institution-letters/2005/fil140 5a.html; Martorello_01219 4 |

| | | | |
|---|---|---|---|
| | | lenders, including arrangements to originate loans on terms that could not be offered directly by the payday lender."  The FDICO also directly addresses "<u>payday lending programs that they administer… [through] arrangements with third parties</u>" where the "<u>the institution typically enters into an agreement in which the institution funds payday loans originated through the third party</u>" and "<u>also may involved the sale to the third party of the loans or servicing rights to the loans… [and] additional services that the bank would normally provide, including collections, advertising and soliciting applications.</u>"  The FDIC reaffirms **such programs "in no way diminishes the responsibility of the board of directors and management to ensure that the third-party activity is conducted in a safe and sound manner and in compliance with policies and applicable laws.** Appropriate corrective actions, including enforcement actions, may be pursued for deficiencies related to a third-party relationship that pose concerns about either safety and soundness or the adequacy of protection afforded to consumers." Produced by Martorello. | |
| November 3, 2015 | Rosette Law | **Rosette Legal Opinion** – Ms. Wichtman issued and opinion to BPL's bank stating that **BPL is "wholly owned and operated"** by the Tribe and **given Congress expressly recognized tribal regulatory authority under Title X of the Dodd-Frank Act, no state may preempt tribal regulatory authority.**  "<u>Unless and until Congress explicitly abrogates tribal sovereignty in the arena of short-term online lending, loans made by Indian tribes within their sovereign powers and pursuant to tribal authority, procedures and regulations should be deemed lawful.</u>"  Ms. Wichtman validated the accuracy of numerous legal opinions that she authored and **shared with Martorello.** | LVD-DEF00004956; K. Wichtman Dep. July 14, 2020 at 152:7-173:18 |
| December 8, 2015 | Rosette Law | **Rosette Legal Opinion** – Ms. Wichtman issued an opinion to the 3rd party hedge fund that funded debt to RRTL for its loan capital, **reviewing all relevant laws and agreements to opine there is no violation of any appliable law**, <u>the consumer loans and borrower agreements are enforceable</u> | CW_03427; Wichtman Dep. July 14, 2020 at 152:7-173:18 |

| | | <u>under the Tribe's laws</u>.  Ms. Wichtman validated the accuracy of numerous legal opinions that she authored and **shared with Martorello**. | |
|---|---|---|---|
| 2015 | Regulatory Attorney J. Galloway | **Regulatory Audit** – Annual Regulatory Compliance Review for Duck Creek Tribal Financial and Red Rock Tribal Lending.  Ms. Galloway testified that **they were in compliance** with their respective CMS and policies and with tribal and federal consumer financial laws, and that they took that compliance with the law seriously. | Galloway Dep. Ex. 2; *supra* |
| February 16, 2016 | Rosette Law | **Rosette Legal Opinion** – Issued to the 3rd party hedge fund that provided debt for BPL's consumer loan capital - **analyzing 25 legal documents and contracts (including delegations of authority and Servicing Agreement) and opining that all of the creditor's covenants are legal and enforceable and that BPL's loans are valid and enforceable**. Ms. Wichtman validated the accuracy of numerous legal opinions that she authored and **shared with Martorello**. | Rosette_Revised_0 25001; Wichtman Dep. July 14, 2020 at 152:7-173:18 |
| July 29, 2016 | FDIC | **FDIC Guidance "for Third-Party Lending"** – FDIC issues guidance embracing banks "originating loans **for third parties**" to export state interest rates under federal preemption. (emphasis in original). "In these situations, an insured institution typically serves as the originator for an entity that lacks the necessary licenses or charter to lend on its own behalf or seeks to take advantage of the institution's ability to export interest rates." | [https://www.fdic.gov/news/financial-institution-letters/2016/fil16050a.pdf](https://www.fdic.gov/news/financial-institution-letters/2016/fil16050a.pdf) (page 2); [https://www.fdic.gov/news/financial-institution-letters/2016/fil16050b.pdf](https://www.fdic.gov/news/financial-institution-letters/2016/fil16050b.pdf). |
| March 9, 2017 | Former Assistant Director of CFPB | **Hudson Cook Legal Memo (Regulatory Pressures Failed)** – Mr. Hackett issues Martorello a legal memo detailing the rise of regulatory pressures, "Operation Chokepoint", in late fall 2013 and subsequent self-admonishment by Congress, the DOJ and the FDIC. Opining **Martorello was correct to believe in the continuity of his business by 2015**. | Martorello_01125 7; [https://www.fdic.gov/transparency/legal-misc/statement-and-letter-on-bank-customer-relationships.pdf](https://www.fdic.gov/transparency/legal-misc/statement-and-letter-on-bank-customer-relationships.pdf); [http://alliedprogress.org/wp-content/uploads/20](http://alliedprogress.org/wp-content/uploads/20) |

| | | | 17/08/2017-8-16-Operation-Chokepoint-Goodlatte.pdf; |
|---|---|---|---|
| November 27, 2017 | GT Law | **GT Legal Opinion** - Weddle authored Amicus brief on behalf of the National Congress of American Indians ("NCAI") in *CFPB v. Golden Valley Lending, Inc. et al.*, No. 2:17-cv-02521-JAR-JPO (D. Kan.) p. 17 "**There is no applicable state law here**". | NCAI_Brief_in_Support_of_MTD_Case_No_2_17-cv-02521.pdf; JUSTIN_MARTORELLO_08113; Weddle Dep. Ex. 25 |
| **GT AND ROSETTE ESTABLISHING THE LENDING OPERATION AT ISSUE – ROSETTE LAW AND CONNER AND WINTERS LLP CREATED THE SALE STRUCTURE** | | | |
| October 11, 2011 | Rosette Law | Already enacted lending code (online secured and vehicle transactions only, no unsecured sections) is **emailed to Weddle** and Martorello along with licensing forms required; already existing resolution altered to form RRTL; and articles of organization (with authority for outside management). | ROS002-0001007; 1010; 1017; 1019 |
| October 12, 2011 | GT Law | **Weddle is involved in getting Martorello licensed** and ensuring that related resolutions were duly authorized approved by Tribal Council. | ROS002-00001056; see also Weddle Dep. Feb 15, 2023 at 21:25-22:24. |
| October 13, 2011 | Rosette Law | Rosette Law CFO circulates an email (including Weddle and Martorello) a "items to complete" **task list** for an "all hands call" in advance of the Oct 25, 2011 tribal council meeting. | ROS002-00000008; ROS002-00000009 |
| October 19, 2011 | GT Law | **Weddle has received** the Tribe's already existing lending code, resolutions, vendor applications and numerous other Tribal formation documents. | Rosette_Revised_007004 |
| October 21, 2011 | GT Law | Weddle emails Wichtman that **GT finished a "team call"** and **will be sending Rosette law's Ms. Wichtman transaction documents including "two servicing agreements",** which is the legal advice upon which Martorello relied. Ms. Weddle suggests that Martorello wire two | ROS002-00000084 |

| | | $5000 incentive payments for the Tribe, for each business. | |
|---|---|---|---|
| October 21, 2011 | GT Law | **Weddle** emails Wichtman, stating that **the draft servicing agreements are being redlined** from "the RS deal", which was an LVD online lending business that predates LVD's relationship with the company Eventide sold (Bellicose and its subsidiaries). | Rosette_Revised_0 10271 |
| October 22, 2011 | GT Law | **Ms. Weddle sends to the Tribe and Martorello the draft Red Rock Tribal Lending ("RRTL") Servicing Agreement,** the advice of counsel central to this case.  GT also informs the tribe and Martorello they are working on terms for a 3rd party hedge fund to loan RRTL capital. **The tribal representatives request Ms. Weddle to redline the Tribal lending code** and ordinance already in existence, and Ms. Weddle confirms, to them and Martorello, that **she agrees to do so**. | ROS002-00000138 |
| October 22, 2011 | GT Law | Ms. Weddle sends Wichtman and Martorello <u>GT's comments</u> on an existing draft RRTL resolution creating it, which is described as "**modeled from the resolution created for the Tribe's** <u>title lending business</u>" and involved "changes made **to [GT's] form resolution** base upon input and request of the Tribal Council." | ROS002-00000651 |
| October 22, 2011 | GT Law | Ms. Weddle emails Martorello and the tribal personnel that "the RRTL lending effort will be funded with capital from a New York hedge-fund, Alpha Credit Resources", as such, **GT have been "working on terms sheet for the Loan Agreement or the $10 million to be advanced by Alpha to RRTL."** She states that "Alpha is represented by Troutman Sanders" and that **GT "responded to the initial terms sheet advanced by Troutman."**  GT's edits to Troutman's are attached. | ROS002-00000656; ROS002-00000667 |
| October 23, 2011 | GT Law | Rosette Law CFO sends Weddle and Martorello "inventory of **documents… we have received from GT**". | ROS002-00000052; |

| October 23, 2011 | GT Law | Ms. **Weddle sends v1.0 of the RRTL Servicing Agreement**, and Rosette Law sends edits.  The version notes an "Operations Manager" is optional and that Martorello's company could indeed perform the "business management" services and details the economic arrangements within.  Ms. Weddle testifies that she used the **National Indian Gaming Commission's templates** for the Servicing Agreements. Ms. Weddle also sends numerous creditor contracts for a Bellicose affiliate "Iron Fence Investments" to raise money and fund the Tribe money for its consumer loan operation. | ROS002-00000607; ROS002-00000612; Weddle Dep. May 20, 2019 at 117:11-119:13 |
|---|---|---|---|
| October 24, 2011 | GT Law | Ms. **Weddle sends** Martorello and the tribal representatives **numerous creditor documents for debt between the tribal lending entity client and Bellicose affiliate** "Iron Fence Investments" to raise money and fund the Tribe money for its consumer loan operation. | ROS002-00000213; ROS002-00000214; ROS002-00000222; ROS002-00000255; ROS002-00000275; ROS002-00000285 |
| October 26, 2011 | GT Law | **Weddle and Martorello are sent Tribal Council's official resolutions approving the execution of the RRTL Servicing Agreement** with Bellicose VI and other loan transaction documents.  Weddle is asked to send a letter she was "drafting outlining all of Matt's entities relevant to RRTL…". | ROS002-00000880 and 896 |
| November 4, 2011 | GT Law | Martorello involves **another GT attorney, Scott Sheehan to review and redline a contract between RRTL and a debt buyer**. | Rosette_Revised_001763 and 1764 |
| November 9, 2011 | GT Law | Martorello emails tribal representatives and **Ms. Weddle regarding documents for RRTL to establish its ACH processing**. | ROS002-00000050 |
| November 10, 2011 | GT Law | Weddle emails tribal representatives and Martorello that **she is "preparing a closing checklist to reflect everything we need** for [Tribal Council meeting]". | ROS002-00000294 |

| November 10, 2011 | GT Law | Ms. **Weddle sends** Martorello and the tribal representatives **numerous creditor documents for debt between the tribal lending entity client and Bellicose affiliate** "Iron Fence Investments" to raise money and fund the Tribe money for its consumer loan operation. | ROS002-00000297; 298; 307; 328; 336 |
|---|---|---|---|
| November 11, 2011 | GT Law | <u>GT lawyers draft and send Martorello and tribal representatives an asset purchase agreement for LVD to buy the business of Martorello's prior client</u> and a legal opinion that said business is lawful. | ROS002-00000342; 377 Rosette_Revised_004218 and 04219; 2838 and 2846; 3649 and 3650 |
| November 11, 2011 | GT Law | Weddle sends Martorello and tribal representatives an initial draft of another Servicing Agreement that will mirror RRTL's and recommends a resolution from Tribal Council. | ROS002-00000479; 413 |
| November 11, 2011 | GT Law | **<u>GT/Weddle drafts and sends Martorello and tribal representatives numerous "RRTL consumer documents"</u> that would be "put into use by the Enterprise on or about Dec. 1"**. This includes the <u>RRTL consumer loan agreement</u>, <u>consumer loan application</u>, adverse action notices, privacy policy, and automated ACH debit authorization.  Plaintiff's counsel "represents to [Ms. Weddle that] the loan agreements that were, for the large part, drafted by Greenberg Traurig… were [ruled] invalid…" | ROS002-00000468 and Weddle Dep. Feb 15, 2023 at 90:5-14. |
| November 11, 2011 | GT Law | **<u>GT reviewed and edited LVD's tribal lending code</u>**.  Weddle sends Martorello and tribal representatives GT's "proposed additions to the Tribal Consumer Financial Services Regulatory Code."  GT attorney Scott Sheehan will be conducting additional review. | ROS002-0001187; 88 |
| November 12, 2011 | GT Law | Ms. Weddle emails Martorello and tribal representatives answering Ms. Wichtman's questions and <u>explaining the deal's financing concepts related to the RRTL servicing agreement</u> and why "RRTL will need to start stockpiling cash periodically to make [debt] payments" | ROS002-00000717 |

| November 12, 2011 | GT Law | Weddle does a trademark search and in turn provides IP advice to tribal representatives (copies Martorello) relating to an IP law challenge to the tribal lender's name suggested by LVD council. | ROS002-00000711 |
|---|---|---|---|
| November 14, 2011 | GT Law | **Weddle sends Martorello and tribal representatives a Servicing Agreement "clean copy for signatures" and a tribal resolution for Tribal Council** and discusses foreclosure options on intangible property. | ROS002-00000812; 761; 800 |
| November 15, 2011 | GT Law | GT's Ben Huber sends Martorello, Weddle and Wichtman a term sheet with 3rd party hedge fund, and capital provider to RRTL for its consumer loans, that "Bellicose is fine with" and seeking "review from LVD's perspective". Weddle later sends the final version to Martorello, and the Tribal LLC Managers and members of council. | Rosette_Revised_0 01325; 1326; 1334 and 1335 |
| November 16, 2011 | GT Law | GT attorney Ben Huber sends Weddle, Martorello and Wichtman a servicing agreement with another Bellicose affiliated entity, 7X, which is a "servicing agreement whereby RRTL will contract with 7X to provide LMS [loan management software] and Leads (as well as any other services the parties may agree)" and the agreements will tie to Iron Fence debt documents. | Rosette_Revised_0 01145 and 46 |
| November 18, 2011 | Rosette Law | Ms. Wichtman reports to Martorello and Ms. Weddle and GT attorney Huber that Tribal Council were presented with and approved various documents and resolutions | ROS002-0000855 |
| November 21, 2011 | GT Law | Another GT closing task list. The Check list allocates **"GT" as "responsible party"** to numerous contracts, agreements and consumer facing tribal lender documents and disclosures and includes vendor setup to both tribal lender and Martorello's company. | Rosette_Revised_0 02831 |
| November 22, 2011 | GT Law | Weddle emails Tribal representatives and Martorello that she would like a call "to review where we're at with respect to all closing documents and operational matters for the start of the business" and GT will "send closing binders with all documents and signature flags directly to | ROS002-00000873 |

| | | | |
|---|---|---|---|
| | | Watersmeet and to Matt for signatures…" Tribal Council has approved and is now GT updating its closing checklist. | |
| December 5, 2011 | GT Law | **Tribal Lender Governing Documents:** Weddle sends Martorello, Huber and Wichtman the RRTL operating agreement which clarifies that the LLC **Manager may (in its discretion) elect to outsource its management duties of RRTL.** Nonetheless, the Manager has a fiduciary duty to the Tribe and RRTL and is only removable by the Tribe.  Similarly, the GT Servicing Agreement renders an "Operations Manager" optional and only appoints a "Tribal Representative" as a "liaison" between RRTL and the Tribe.  Also attached are the RRTL creation resolution and articles of organization. | Rosette_Revised_0 02594 and 002601; 02597; 2599 |
| December 12, 2011 | GT Law | GT/Weddle amend numerous RRTL "consumer loan documents" again and send to Martorello and tribal personnel.  Including the "consumer application", consumer "loan agreement", automated ACH debit authorization, privacy policy and adverse action notices.  Ms. Weddle hoped that **GT's "consumer finance specialists" would complete their review that night.** | Rosette_Revised_0 10990; 011005; 011002; 011000; 010998; 010996; 010995; 010993; 010991 |
| December 15, 2011 | GT Law | Martorello emailed tribal personnel and representatives (**including Weddle) the "Business Plan and the 2012 Servicing Budget[s]" detailing the forecasted economic splits and business forecasts.** | Rosette_Revised_0 01507; Rosette_Revised_0 01508; Rosette_Revised_0 01510 |
| December 21, 2011 | GT Law | Martorello emails Wells Fargo, tribal personnel, and Ms. Weddle and GT's Ben Huber attaching his execution of the Bank Deposit Account Control Agreement and RRTL bank account signatory authority, as expressly permitted within GT's Servicing Agreement. | Rosette_Revised_0 04151 |
| December 28, 2011 | GT Law | Weddle emails Wichtman that the "closing binders" will go out tomorrow and she details numerous operational details Martorello told her he will do for the Tribe's launch.  She informs Wichtman that **Matt will be talking to GT attorney formerly a FTC director for a federal** | Rosette_Revised_0 06142 |

| | | law compliance audit for RRTL "to make sure all procedures are federally compliant (which he thinks they already are, but another check is good)". | |
|---|---|---|---|
| January 4, 2012 | GT Law | Martorello <u>included Weddle on emails re: the RRTL economic splits and forecasts in the "RRTL Business Plan".</u>  Which she testified cause her **"no concern"**. | Rosette_Revised_0 01997; Rosette_Revised_0 01999; Rosette_Revised_0 02002; Weddle Dep May 20, 2019 at 103:1-104:3 and 105:4-10 |
| January 4, 2012 | GT Law | <u>GT attorneys ensured the Bellicose affiliate's Iron Fence UCC-1 financing statements with RRTL were duly, and publicly, filed.</u> | Rosette_Revised_0 03619; 03625 |
| February 7, 2012 | GT Law | Weddle emails Martorello and tribal representatives that <u>Weddle was told by Wells Fargo that RRTL must get state licensed or it will not bank it</u>.  She states, "we would of course not want to register with any state". | Rosette_Revised_0 03691 |
| February 14, 2012 | GT Law | Weddle emails Martorello and Wichtman – "Major Tribal Victory in Colorado" states that GT was involved in the "Cash Advance" case before the Colorado Supreme Court and Tribes win over AG subpoenas is good for the industry. | Rosette_Revised_0 06025 |
| March 21, 2012 | GT Law | Weddle emails Martorello and tribal personnel - "<u>[Weddle has] been in close touch with NCAI about protecting tribal consumer finance</u>" | Rosette_Revised_0 05177 |
| April 2, 2012 | GT Law | Martorello emails tribal personnel and Ms. <u>Weddle of the precise monthly tribal net profits calculations including the monthly revenue and expense reports and economic splits.</u> | Rosette_Revised_0 03608 |
| April 4, 2012 | GT Law | GT's Ben Huber sends Troutman Sanders <u>guaranty agreement and indemnity agreement</u> (along with numerous other creditor documents) whereby SPVI would guarantee the hedge fund, Alpha Credit.  Weddle comments on the loan agreement. | Rosette_Revised_0 00005; 50; 56; 122 and 123 |

| | | | |
|---|---|---|---|
| April 12, 2012 | GT Law | GT's Huber emails Martorello, Weddle and Wichtman facilitating assignment of the Servicing Agreements from Bellicose to SPVI and executed July 10, 2012 and Martorello reverts with final signatures.  The Agreement still maintains "Tribe and Enterprise have been represented by Rosette, LLP… **Servicer has been represented by Greenberg Traurig LLP**…" and "each and every law of the Tribe or otherwise that may pertain to the transactions and activities contemplated" are set forth in Schedule 1.0, "**there are no laws, requirements or restrictions that are reasonably known to the Parties… that could apply to such transactions…<u>including but [not]</u> <u>limited to laws, requirements or</u> <u>restrictions related to civil or criminal usury</u>**". | Rosette_Revised_0 00245; 246; 247; 1963; 2303 and 2306 |
| May 7, 2012 | GT Law | Martorello emails tribal personnel and <u>Weddle and Huber with an amended annual business plan to generate ancillary marketing revenues for RRTL, and are privy to the economic splits</u>.  Four weeks later, Tribal Council member and RRTL manager approves, subject to seeks legal review for compliance first. | Rosette_Revised_0 02331 |
| July 12, 2012 | GT Law | GT lawyers emailing with RRTL's attorney, without Martorello, <u>negotiating issues relating to a debt facility for RRTL's consumer loan capital</u>. | Rosette_Revised_0 06684 |
| November 21, 2012 | GT Law | GT Huber and Weddle email Martorello and Wichtman numerous creditor protection agreements, they prepare for closing and coordinate execution.  Including "Loan and Security Agreement", "Guaranty", "Indemnity Agreement", "Promissory Note", "Intercreditor Agreement", "Priorities", "Security Agreement", "Confession of Judgment", "POA for ACH Provider" and "Side Letter re Waiver of Immunity for DACA". | Rosette_Revised_0 00792; 00819; 003780 |
| November 28, 2012 | GT Law | GT's Huber emails Wichtman, Martorello and Weddle circulating numerous closing instructions and documents for the Alpha Credit facility, including <u>closing checklist with GT responsibilities assigned including three legal opinions</u>. | Rosette_Revised_0 05008; 005158 |

| June 17, 2013 | GT Law | GT emails Troutman Sanders, Wichtman and Martorello to <u>facilitate RRTL's draw from its Alpha Credit debt facility</u>.  Martorello emails Weddle and others apprising them of RRTL's receipt of funds in conjunction with RRTL and council member Mansfield's draw request from 3rd party debt provider, and <u>GT involved in amendments to the Alpha facility</u> | Rosette_Revised_0 02012; CM0001170 |
|---|---|---|---|
| June 20, 2013 | GT Law | GT's Huber and Weddle email Wichtman, seeking <u>discussion about the potential for "LVD Children's Fund" to invest in RRTL</u>.  <u>GT wants to "be able to accurately explain the proposal" to Alpha Credit</u>. | Rosette_Revised_0 01158 |
| August 7, 2013 | GT Law | Weddle on numerous emails with Martorello, tribal personnel and Rosette attorneys relating to NY DFS, interaction with DFS and with banks, <u>arranges a meeting between NY and LVD's Chairman</u>, and seeks to prove the legal basis for RRTL's lending.  Weddle notes what her "<u>legal advice to [Martorello] has been</u>" and that to her, "it is an honor and a privilege to work to protect Tribal enterprises like Red Rock", that "many state don't like short-term lending" and "the fact that **New York takes positions offensive to Tribal sovereignty and legally incorrect** just doesn't matter to the banks or probably to the media." | Rosette_Revised_0 02748; 2732; 2741; 2770 |
| August 9, 2013 | GT Law | Ms. Weddle emails Martorello in response to NACHA sending the same letter as NY DFS and DOJ sent to banks regarding tribal lending.  Weddle says "we should escalate the federal strategy very quickly.  I can <u>call Charlie Galbraith of the White House on his cell this weekend</u>… I also think we need to <u>send up the NCAI bat signal now</u>" and she will call the NCAI President and General Counsel on the matters. | Rosette_Revised_0 06787 |
| October 23, 2013 | GT Law | Weddle emails with Martorello's in-house counsel (Gravel) and Wichtman.  She encourages RRTL information sharing for a by a consumer lender suit against an ACH processor related to RRTL's lending operations. | Rosette_Revised_0 02356 |

| August 20, 2014 | GT Law | GT lawyers copied with Martorello on emails - still involved in RRTL and Alpha Credit debt relationship | Rosette_Revised_004604; 2799 |
| October 9, 2014 | GT Law | Martorello emails Wichtman regarding "Sale" trying to assess tax impact of a **sale structure**, for which he had consulted Weddle. | Rosette_Revised_046191 |
| January 7, 2015 | GT Law | Martorello emails Weddle, his in-house GC and numerous tribal personnel with SPVI suggested business plans and budgets for RRTL, which detail the SPVI servicing fee vs Tribal Net Profits | Rosette_Revised_000265; 268 |