Michael A. Caddell
Texas State Bar No. 03576700
John B. Scofield, Jr., *pro hac vice*
**CADDELL & CHAPMAN**
628 East 9th Street
Houston, Texas 77007
Telephone: (713) 751-0400
Facsimile: (713) 751-0906
Email: mac@caddellchapman.com
Email: jbs@caddellchapman.com

Kristi C. Kelly, *pro hac vice*
Andrew J. Guzzo, *pro hac vice*
**KELLY GUZZO, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572 - Telephone
(703) 591-0167 - Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

*Attorneys for Creditors,*
*Virginia Class Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| In re:<br><br>EVENTIDE CREDIT ACQUISITIONS, LLC, *et al.*[1]<br><br>                    Debtors. | Chapter 11<br><br>Case No. 23-90007-mxm11<br><br>(Jointly Administered) |

**MOTION TO DISMISS THE BANKRUPTCY OF BWH TEXAS, LLC**
**OR, IN THE ALTERNATIVE, TO ABSTAIN**

Consumer Borrowers Renee Galloway, Dianne Turner, Dominique de la Bay, Lori

Fitzgerald, Andrea Scarborough, Earl Browne, Rose Marie Buchert, Regina Nolte, Kevin Minor,

Teresa Titius, Burry Pough, Lisa Martinez, Sonji Grandy, Anastasia Sherman, Jerry Avent,

Lucinda Gray, Anthony Green, Linda Madison, Derek Geter, Keisha Hamm, Faith Thomas,

Sharon Paavo, and Latanya Tarleton (collectively, the "Consumer Borrowers") hereby move for

an order, pursuant to Section 1112(b) of title 11 of the United States Code (the "Bankruptcy

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Eventide Credit Acquisitions, LLC (1353) and BWH Texas LLC (9205).

Code"), dismissing the Chapter 11 proceeding of BWH Texas, LLC ("BWH" or the "Debtor") or, in the alternative, request that the Court abstain from hearing the above-referenced case in accordance with Section 305 of the Bankruptcy Code (this "Motion"). In support of this Motion, the Consumer Borrowers show the following:

## PRELIMINARY STATEMENT

1.      The Bankruptcy Code provides the proverbial "honest but unfortunate" debtor an opportunity to reorganize its business and/or financial affairs. However, the Bankruptcy Code expressly recognizes that certain types of cases (and certain types of debtors) simply do not belong in bankruptcy court. As such, the Bankruptcy Code vests this Court with broad discretion to address improper bankruptcy filings through either dismissal or abstention. Among those are cases in which a debtor attempts to utilize the Bankruptcy Code as a litigation tactic and/or to forum shop. This is a quintessential example of one of those cases.

2.      Here, the Debtor has no operations, no employees, and no need to reorganize. Its primary purpose is to function as a conduit for payments from Eventide Credit Acquisitions, LLC, ("Eventide") which are then distributed to offshore asset protection trusts created by the Debtor's lone insider, Matt Martorello. The Debtor has no vendors, no landlords, no secured lender and no customers. Instead, its legitimate creditors consist exclusively of consumer borrowers, like the movants, who paid usurious interest on installment loans.

3.      The Debtor is here to delay and forum shop, not to reorganize.  As described below, the Debtor is subject to only one lawsuit, the case brought by Consumer Borrowers in the Eastern District of Virginia, and the Debtor commenced this bankruptcy case after multiple unfavorable rulings against it in that matter. *See Galloway v. Martorello*, No. 3:19-cv-314(REP), 2023 WL 5183204, at *1 (E.D. Va. Aug. 11, 2023) ("*Galloway*" or "*Galloway II*") (holding the

2

court had personal jurisdiction over Breakwater); *Galloway*, 2023 WL 5180332, at *1 (E.D. Va. Aug. 11, 2023) (holding that Breakwater was properly served); *Galloway*, 2023 WL 6518085, at *1 (E.D. Va. Oct. 5, 2023). <u>Four days</u> after the court resolved the final one of these motions, the Debtor filed this bankruptcy action.

4.      The Eastern District of Virginia (where the Consumer Borrowers case has been pending since 2019) is best positioned to resolve the dispute, and the Debtor cannot show that a reorganization under the Bankruptcy Code is either necessary or possible. In reality, the Debtor's bankruptcy filing was for the sole purpose to delay and hinder the Virginia litigation. Indeed, the Eastern District of Virginia has recently remarked:

> Well, let me say this. I've studied considerably the questions about BWH and the various and sundry matters that have been asserted in the cases here, *Williams* and *Galloway*, by Mr. Martorello and his related companies, and I have some difficulty understanding whether there is any legitimacy at all to the BWH bankruptcy, much less whether or not there is any legitimacy to *Galloway*, that in the *Galloway* case nonparties should have any benefit of any stay that exists there at all based on what I have been able to read.
>
> Previously, there has been efforts to exploit the bankruptcy process in this case by a bankruptcy that was dismissed as a frivolous one, and I will trust that the bankruptcy court will see through these continued efforts to delay these proceedings by any means whatsoever and rule on them. And I, therefore, will grant this motion, but I will not grant it as asked. If the bankruptcy court has not resolved this matter, then this Court has the right to protect its own jurisdiction as matters that don't apply to the debtor, and if somebody wants to fight about it, they can fight about it. There are limits that can be tolerated, and Martorello, his related entities and people are tacking so close to the wind that they are close to obstructing justice here, and I don't intend to see it go forward or be allowed here.

*Galloway*, Jan. 4, 2024 Hr'g Trans. at 4:25-5:25 (previously filed at ECF 139-2).

5.      Other than bad faith forum shopping to benefit Martorello, there is simply no valid bankruptcy purpose to be served by this case. Accordingly, for the reasons set forth below, the Consumer Borrowers respectfully request that the Court dismiss this case or abstain.

## RELEVANT FACTUAL BACKGROUND

### I.    Martorello's Illegal Lending Scheme

6.    Beginning in 2011, Martorello partnered with the Lac Vieux Desert Band of Lake Superior Chippewa Indians (the "Tribe") to make loans over the internet that typically exceed 500% interest and violate state usury laws. The lending scheme has operated in two distinct phases.

7.    From 2011 to 2016, Martorello and his companies, including Bellicose VI, LLC and SourcePoint VI, LLC ("SPVI"), partnered with Tribe-owned Red Rock Tribal Lending, LLC ("Red Rock"). Ex. 1, Oct. 25 2011 Servicing Agreement. Although characterized as a "servicing agreement," the contract provided Martorello's companies with the authority to exercise almost exclusive control over Red Rock's operations. *See generally id*. For example, the contract provided that Bellicose VI "shall have the authority and responsibility over all communication and interaction whatsoever between [Red Rock] and each service provider, lender and other agents of [Red Rock]." *Id*. at § 3.1; *see also id*. at § 4.1.1 (granting Bellicose VI "the necessary power and authority to act in order to fulfill its responsibilities" under the contract). In exchange for running the business, Martorello's company received 98% of the gross income of the lending enterprise, Red Rock received 1% of the gross revenue, and a company owned by Robert Rosette, the Tribe's lawyer, received 1% of the gross revenue. *Id*. at § 3.5.1; *id*. at 2.25; *id*. § 7.15.

8.    As explained by the former Vice Chairwoman of the Tribe: "When Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Ex. 2 at ¶¶ 3. As she further explained: "[a]fter

the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." *Id*. at ¶ 4.

9.      In 2013, the New York Department of Financial Services issued cease and desist letters to a variety of online lenders and other entities, including Red Rock. Without disclosing the dominant role of Martorello in its operations, Red Rock filed a lawsuit in August 2013, seeking declaratory relief and a preliminary injunction that tribal businesses were inherently sovereign nations and not subject to New York law. *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013), *aff'd*, 769 F.3d 105 (2d Cir. 2014). The district court denied Red Rock's request for a preliminary injunction on September 30, 2013, finding that the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands," and thus, Red Rock was "subject to the State's non-discriminatory anti-usury laws." *Id*. at 361. The court reasoned, "There is simply no basis… that the Tribes are treated differently from any other individuals or entities that enter New York to lend to New York residents." *Id*.

10.     Two days later, Martorello wrote that the decision "presents a significant potential liability for [Bellicose] and we do not believe that we should service any new New York loans." Ex. 3 at Rosette 06304-5. Martorello further added that they were willing to see existing loans through completion, "but [they] simply cannot flaunt the clear ruling from Judge Sullivan's order, however legally incorrect it might be." *Id*. Martorello further stated a concern that the "finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final… such that it will precipitate their potential investigation and potential prosecution of us

personally and our companies if we continue" to conduct business in New York. *Id*.

11.    Two weeks after the district court's decision, Martorello had come up with a solution to reduce his liability and approached Robert Rosette regarding a restructure to protect Martorello/Bellicose. *See generally* Ex. 4.  In an e-mail dated October 14, 2013, with a subject matter entitled "<u>LVD to take ownership of Bellicose VI</u>," Martorello presented some options for a restructure so that Bellicose could attempt to share in the LVD's immunity. *Id*. (emphasis added). Martorello proposed that Bellicose would "[a]ssign today LVD 51% of Bellicose via <u>Equity only</u> membership interest tied to the SPVI subsidiary only." *Id*. (emphasis in original).

12.    Additionally, Martorello proposed assigning 51% of the interests in his other businesses involved in the scheme. *Id*. Anticipating the business would be shut down, Martorello further proposed that Bluetech Irrevocable Trust fka M. Martorello Irrevocable Trust ("<u>Bluetech</u>"), his trust, would "own 49% equity [of the lending services company], but 100% profits interests until month 49," *i.e.*, ensuring Martorello would retain the profits until the business was gone. *Id*. Martorello's e-mail candidly explained that the transaction must be "structured to provide <u>all entities sovereign immunity</u>." *Id*. (emphasis added).

13.    A few weeks later, Martorello continued to voice his concerns to Karrie Wichtman, one of the Tribe's lawyers. In this e-mail dated October 29, 2013, Martorello informed Wichtman that vendors and finance providers of Red Rock were "asking what would happen to everything if the ruling in NY were upheld[?]" Ex. 5.  The repercussions, according to Martorello's e-mail, would be "<u>certain death</u>" and "all vendors including [SPVIt], banks, ACH processors, bureaus etc would all obviously shut down if it were considered off reservation activity[.]" *Id*. (emphasis added).

14.    On November 8, 2013, Martorello sent a similar e-mail to Wichtman, explaining

that Red Rock was "down now about 55% from where it was in July," and Martorello further added that SPVI was "about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims" coming in the first quarter of 2014. Ex. 6 at Rosette_Revised_052787. And similar to his earlier emails, Martorello reiterated that there was a "very significant possibility that should we even survive long enough to get there," he would need "to defend [him]self even personally (in more than civil matters), with no ongoing business or revenue at all should the decision be made in the appeal that the activity is in fact OFF reservation (a certain end to the industry)." *Id.* (capitals in original).

15.    Over the next month, the parties did not make significant progress on the key terms or mechanics of the sale, but on October 1, 2014, it became urgent when the Second Circuit affirmed the district court's decision in *Otoe-Missouria*. In doing so, the Second Circuit made several damaging findings, including that "New York's usury laws apply to all lenders, not just tribal lenders[.]" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 117 (2d Cir. 2014). The Second Circuit also observed that "Native Americans 'going beyond the reservation boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] … otherwise applicable to all citizens of [that] State." *Id.* at 113 (citations omitted). Against this backdrop, the Second Circuit observed that "[m]uch of the commercial activity at issue takes place in New York." *Id.* at 115. It reached all of these conclusions even though LVD/Red Rock never disclosed to the district court or Second Circuit the role of Martorello's companies in the operations. *See generally id*.

16.    After the Second Circuit issued its decision, Martorello wrote an e-mail to Wichtman on October 10, 2014, urging her to drop the case. Ex. 7 at Rosette 043659 ("I can't urge any stronger that LVD not proceed even if [O]toe does."). Martorello also indicated that "SPVI

won't be willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team." *Id*. Ultimately, Wichtman agreed, and as she explained in a subsequent e-mail to Martorello, their best option was to "***go quietly into the night and restructure*** based on what we know from the opinion in order to build an even stronger case for future litigation." Ex. 8 at Rosette 001130 (emphasis added).

17.      Following the Second Circuit's decision, Martorello created a new company, Eventide, on February 9, 2015, in an effort to exploit sovereign immunity and conceal his role. Ex. 9. After months of negotiations, Martorello and the Tribe reached the basic terms of the restructure, which are embodied in an "Agreement and Plan of Merger" dated September 14, 2015. *See generally* Ex. 10.

18.      Pursuant to § 2.7 of the Agreement and Plan of Merger, Martorello "sold" Bellicose to the LVD in exchange for a $300,000,000 promissory note to Eventide, which was planned to sunset after seven years. *Id.* § 2.7. The transactions under the Merger Documents closed on January 26, 2016, thereby commencing the Second Phase of the lending scheme which continues to this day (the "Second Phase").  Ex. 11.

19.      Despite this restructure, the United States District Court for the Eastern District of Virginia and Fourth Circuit have found that Martorello has been the " 'de facto head' of the Tribe's lending operations during the class period." *Williams v. Martorello*, 59 F.4th 68, 88 (4th Cir. 2023).

## II.   The Debtor and Litigation Regarding the Lending Scheme

20.      To protect the illegal funds, Martorello set up and controlled a maze of companies and trusts through which money from the illegal lending scheme was distributed.  Until August 30, 2023, the Debtor was a Cook Islands LLC known as Breakwater Holding LLC. Ex. 12 at 1

n.1.  On August 30, 2023, it was registered as a Texas LLC under the name BWH Texas, LLC.
*Id.*

21.     Debtor was wholly owned subsidiary of Bluetech, a Cook Islands Trust to which
Martorello ultimately funneled much of his money from the lending scheme.  *Id.* at 7.  Bluetech
was dissolved on October 6, 2023, and its assets were transferred to the Debtor.  *See Galloway* ,
ECF 616 (notice of termination indicating that "Defendant Bluetech Irrevocable Trust has been
terminated effective October 6, 2023"); *see also id*. at ECF No. 633 (asserting that "[a]fter
assigning all of its assets and liabilities to BWH, Bluetech terminated on October 6, 2023.")

22.     According to the Debtor, "from early 2013 until December 31, 2013," the Debtor
owned 100% of the equity and voting interested in Bellicose VI.  Ex. 12 at 6.

23.     From January 1, 2016 until present, Debtor owned 59.6% of the economic interest
in Eventide and 100% of the voting interest in Eventide. Ex. 12 at 7. According to the Debtor,
"Breakwater Holding, LLC is a passive holding company established for the purpose of holding
investments of [Bluetech]. . .  It does not engage in business and has always served as a holding
company, and nothing more.  *Id.* at 6.

24.     As demonstrated, there have been recent changes to the Debtor's corporate form
and its owner, Bluetech, dissolved.  The current poster of the litigation regarding the lending
enterprise is the impetus behind these recent changes.  For years, Martorello's lending enterprise
and his violations of state and federal laws became the subject of several class action lawsuits,
including litigation pending before Senior District Judge Robert Payne of the Eastern District of
Virginia ("Judge Payne").  The first case was filed on June 22, 2017. *See generally Williams v.
Big Picture Loans, LLC*, No. 3:17-cv-461, ECF 1 (E.D. Va. June 22, 2017) ("*Williams*").

25.     Various consumer borrowers eventually initiated several ancillary suits, including

a suit against the Debtor, in the same court. Of the lawsuits related to the lending scheme, the

Debtor is the defendant in only one case.  The below chart summarizes the current cases related

to the tribal lending scheme:

| Case | Date Filed | Status/Comments |
|---|---|---|
| *Williams, et al,. v. Big Picture Loans, LLC et al.*, No. 3:17-cv-461 (E.D. Va.) ("*Williams*") | June 22, 2017 | Debtor is <u>not</u> a party. Judgement entered  against Matt Martorello on behalf of certified Virginia class. Currently on appeal to the Fourth Circuit Court of Appeals. |
| *Galloway, et al,. v. Big Picture Loans, LLC et al.*, No. 3:18-cv-406 (E.D. Va.) ("*Galloway I*") | June 11, 2018 | Debtor is <u>not</u> a party. |
| *Smith v. Martorello and Eventide Credit Acquisitions, LLC*, No. 3:18-cv-01651-AR (D. Or.) ("*Smith*") | September 11, 2018 | Debtor is <u>not</u> a party. |
| *Duggan v. Martorello and Eventide Acquisitions, LLC*, No. 1:18-cv-12277-JGD ( D.   Mass.) ("*Duggan*") | October 31, 2018 | Debtor is <u>not</u> a party. |
| *Galloway, et al., v. Martorello, et al.*, No. 3:19-cv-00317-REP (E.D. Va.) ("*Galloway*" or "*Galloway II*") | April 24, 2019 | Debtor is a party. |

26.    Shortly before the filing of this bankruptcy, Judge Payne made several dispositive

rulings against Martorello—all of which would be relevant to the claims against the Debtor for

similar and consistent rulings. For example, on September 22, 2023, Judge Payne granted

summary judgment on behalf of the certified class of Virginia borrowers against Martorello for

violations of the federal RICO act, 18 U.S.C. § 1964, a ruling that would be applicable to the

Debtor here. *Williams*, 2023 WL 6302560 (E.D. Va. Sept. 22, 2023).  On September 22, 2023,

Judge Payne entered judgment for $43,401,814.47 against Martorello on behalf of the Virginia

Plaintiffs.  Ex. 13. Martorello has appealed Judge Payne's summary judgment ruling and the

judgment.

27.     Meanwhile, in *Galloway II* where the Debtor is a defendant, Judge Payne also

issued a series of ruling adverse to the Debtor:

- *Galloway*, 2023 WL 5183204, at *1 (E.D. Va. Aug. 11, 2023) (denying Rule
  12(b)(2) motion to dismiss and finding personal jurisdiction existed over Debtor);

- *Galloway*, 2023 WL 5180332, at *1 (E.D. Va. Aug. 11, 2023) (denying Rule
  12(b)(5) motion to dismiss based on improper service);

- *Galloway*, 2023 WL 5229231, at *1 (E.D. Va. Aug. 14, 2023) (denying motion
  for protective order and granting motion to compel discovery, and noting
  "Defendants' request for a protective order, which will only serve to further delay
  discovery, is nothing more than the latest in a long series of attempts to delay and
  obfuscate this litigation."); and

- *Galloway*, 2023 WL 6518085, at *1 (E.D. Va. Oct. 5, 2023) (denying in part
  Breakwater's Rule 12(b)(6) motion to dismiss).

28.     On September 6, 2023, Eventide filed for bankruptcy for the second time.[2]  On

October 9, 2023, the Debtor filed its petition for Chapter 11 bankruptcy.

29.       On November 28, 2023, this Court ordered the Debtor's bankruptcy to be jointly

---

[2]  Mr. Martorello has repeatedly abused the bankruptcy procedures in an attempt to venue shop
and de-rail the progress in the class action litigation.  In 2020, Judge Morris presided
over Eventide's first bankruptcy with two days of evidentiary hearings and a 62-page oral ruling in
which he dismissed Eventide's first bankruptcy and all adversary actions based on findings that
"[Eventide] has not filed and prosecuted the Bankruptcy Case in good faith." *Eventide Credit
Acquisitions, LLC v. Big Picture Loans, LLC* ("*Big Picture Loans*"), No. 20-4030-elm, ECF 40 at
51-52 (Bankr. N.D. Tex. June 9, 2020); *see also In re Eventide Credit Acquisitions, LLC*
("*Eventide I*"), No. 20-40349-elm11, ECF 288 (Bankr. N.D. Tex. June 18, 2020) (order of
dismissal of bankruptcy action).

administered with Eventide's bankruptcy.  Dkt. No. 92.

## III.    The Debtor's Assets and Liabilities

30.    On November 6, 2023, the Debtor filed its Schedules of Assets and Liabilities (the

"Schedules").  Ex. 14.   The Schedules confirm that the Debtor is a holding company with no

business to operate.

31.    Specifically, the Schedules show:

a.   Cash on hand of $20,000;

b.   59.6% of the profit interest and 100% of the voting interest in Eventide;

c.   $100,000 investment in "OpenCo (Canbras Global)";

d.   $201,268.24 in "Artwork (approximately 15 images)";

e.   Receivables from Eventide which consist of $7,086,634.72 secured loan from
     Bluetech (an entity which no longer exists); $3,109,311.87 Equity Distribution
     Receivable due from Eventide, and $3,675 owed to Debtor "for an advance";

f.   No real property or intellectual property;

g.   No employees;

h.   No secured creditors; and

i.   No creditors other than the Consumer Plaintiffs (and other consumer borrowers)
     and $55,969.09 owed to two law firms for legal services, including Virginia law
     firm Woods Rogers Vaneventer Black which represented Debtor in the *Galloway
     II* matter.

32.    The Debtor's monthly operating reports show no disbursements other than a $38

bank fee – further evidence that the Debtor has no ongoing business to operate.  Dkt. 30.

## LEGAL ARGUMENT

### I.   This Case Should be Dismissed Under Section 1112(b) as a Bad Faith Filing

33.      This case was filed in bad faith for the primary purpose of impeding the litigation against the Debtor.  The Debtor has no operations, no employees, and this case does not serve any valid bankruptcy or reorganizational purpose.  Instead, the Debtor's sole focus is shopping for a more favorable forum and to prevent litigation against the Debtor from moving forward in front of Judge Payne.  Indeed, Judge Payne recently remarked:

> Well, let me say this. I've studied considerably the questions about BWH and the various and sundry matters that have been asserted in the cases here, *Williams* and *Galloway*, by Mr. Martorello and his related companies, and I have some difficulty understanding whether there is any legitimacy at all to the BWH bankruptcy, much less whether or not there is any legitimacy to *Galloway*, that in the *Galloway* case nonparties should have any benefit of any stay that exists there at all based on what I have been able to read.

> Previously, there has been efforts to exploit the bankruptcy process in this case by a bankruptcy that was dismissed as a frivolous one, and I will trust that the bankruptcy court will see through these continued efforts to delay these proceedings by any means whatsoever and rule on them. And I, therefore, will grant this motion, but I will not grant it as asked. If the bankruptcy court has not resolved this matter, then this Court has the right to protect its own jurisdiction as matters that don't apply to the debtor, and if somebody wants to fight about it, they can fight about it. There are limits that can be tolerated, and Martorello, his related entities and people are tacking so close to the wind that they are close to obstructing justice here, and I don't intend to see it go forward or be allowed here.

*Galloway*, Jan. 4, 2024 Hr'g Trans. at 4:25-5:25 (previously filed at ECF 139-2).

34.      Pursuant to Section 1112(b)(1) of the Bankruptcy Code, absent unusual circumstances, a court shall dismiss a bankruptcy case "for cause."  Section 1112(b)(1) states, in pertinent part:

> on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate,

13

if the movant establishes cause.

11 U.S.C. § 1112(b)(1).

35.     Section 1112 of the Bankruptcy Code, thus, limits the Court's discretion to refuse
to dismiss or convert a Chapter 11 case upon a finding of cause. *In re 3 Ram, Inc.*, 343 B.R. 113,
119 (Bankr. E.D. Pa. 2006) ("Under new § 1112 when cause is found, the court shall dismiss or
convert unless special circumstances exist that establish that the requested conversion or dismissal
is not in the best interests of creditors and the estate."); *see also In re Broad Creek Edgewater, LP*,
371 B.R. 752, 759 (Bankr. D.S.C. 2007).  "Cause" may be established by a showing that a debtor
lacked good faith in commencing its Chapter 11 case. *In re Humble Place Joint Venture*, 936 F.2d
814, 816-17 (5th Cir. 1991) ("The Bankruptcy Code provision that a Chapter 11 case may be
dismissed 'for cause' has been interpreted to include the lack of good faith in its filing."); *In re
Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986); *In re Phoenix Piccadilly, Ltd.*, 849
F.2d 1393 (11th Cir. 1988) (Chapter 11 petition may be dismissed for "cause" under § 1112(b) if
not filed in good faith).  It is well established that good faith is an implied jurisdictional
requirement for filing a bankruptcy petition. *Little Creek Dev. Co.*, 779 F.2d at 1071 (noting that
bankruptcy reorganization provisions since 1898 have incorporated expressly, or by judicial
interpretation, a good faith standard for the commencement of bankruptcy cases); see also *In re C-
TC 9th Ave. P'ship*, 113 F.3d 1304, 1310 (2d Cir. 1997).

36.     The Fifth Circuit has determined that "[f]indings of lack of good faith … have been
predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate
of factors rather than on any single datum." *Little Creek Dev. Co.*, 779 F.2d at 1072; see also
*Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004) ("[w]hether the good faith
requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine the

14

'totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'") (quoting *In re SGL Carbon Corp.*, 200 F.3d 154, 162 (3d Cir. 1999)).

37.     In determining whether a debtor has instituted a bad faith filing, courts have considered the following non-exclusive factors including, without limitation:

    a.   Whether the debtor has only one asset;

    b.   Whether the debtor has few creditors;

    c.   Whether the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default;

    d.   Whether the debtor's financial condition reflects in essence, a two party dispute between the debtor and creditor which can be resolved in the pending action;

    e.   Whether the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's creditors to enforce their rights in a pending proceeding;

    f.   Whether the debtor has little or no cash flow;

    g.   Whether the debtor lacks the possibility of reorganization; and

    h.   Whether the debtor has any employees.

*See Little Creek Dev. Co.*, 779 F.2d at 1072-1073; *In re Carbaugh*, 299 B.R. 395, 398 (Bankr. N.D. Tex. 2003).   These factors or indicia of bad faith should not, however, be rigidly applied, but viewed broadly in light of the circumstances of a particular case.  *See Little Creek Dev. Co.*, 779 F.2d at 1072.  As a result, "[a]ll the facts and circumstances leading up to the filing of the case, and the conduct of the Debtor during the case, can properly be considered by the Court in determining whether" dismissal is warranted.  *In re Silberkraus*, 253 B.R. 890, 902 (Bankr. C.D.

Cal. 2000).

38.    *Little Creek* and many other decisions involving bad faith filings arose in the context of single-asset real estate cases, and the factors articulated in those cases reflect the often-unique fact patterns applicable to such cases.  Other courts have articulated slightly different hallmarks of bad faith outside the context of single asset real estate cases, but the substance is generally the same.  For example, the court in *In re Serfass*, 325 B.R. 901 (Bankr. M.D. Fla. 2005) held that the "hallmarks of bad faith" include the following:

    a.   pre-petition litigation already pending in the state court between the parties;

    b.   basically a two party dispute;

    c.   the debtor is either solvent or it has very few unsecured debts which the debtor is able to meet;

    d.   the petition is filed for an improper purpose;

    e.   there is no need for reorganization and the filing was for the sole purpose to use the judicial resources of the bankruptcy court, most likely under the assumption that the debtor will receive a more favorable treatment in the bankruptcy court then it had received so far in the state court, and

    f.   there is no ability or sincere desire to reorganize the financial affairs of the debtor.

*Id*. at 905-06.

39.    Almost all of the factors applied by courts addressing the question of a bad faith bankruptcy filing are either present or are inapplicable in this case.

A.    <u>The Debtor filed this case to prevent litigation from proceeding to trial before Judge Payne.</u>

40.    Courts have routinely held that forum shopping is not a valid basis for the filing of a bankruptcy case.  As set forth above, the filing of this case is largely premised upon the Debtor's

desire to evade a series of unfavorable rulings by Judge Payne in the *Galloway II* litigation. Martorello has long attempted to avoid being in front of Judge Payne.

41.     For example, when attempting to sell some of his equity interest in Eventide, Martorello provided the potential buyer with an internal memorandum from Martorello's law firm advising him that an unfavorable outcome was likely before Judge Payne. Ex. 15 ("we do not believe success at trial is likely… In fact, we believe an unfavorable verdict at the trial court level is more likely than not.") *Id*. at PCAM_00417.

42.     Similarly, Martorello's filings in opposition to consolidation of various proceedings before Judge Payne have characterized the judge as "favorably disposed toward" the Consumer Borrowers and "bias[ed] against the Defendants."  *In re: Big Picture Loans Litig.*, MDL No. 2906, ECF 44 at 1-2 (emphasis in original); *see also id*. at 18 ("Judge Payne has displayed bias against Defendants from the outset of the various Virginia actions."); *see also id*. at 18 ("the Motion to Transfer is a transparent effort to place the varied claims raised across the country before a court that will look most favorably upon them. Judge Payne has displayed bias against Defendants from the outset of the various Virginia actions."); *id*. at 19 ("Judge Payne—no ally to Defendants—has determined. . . ."); *id*. at 20 ("The Motion to Transfer is simply an effort to capitalize on the favoritism Plaintiffs have discovered in one court in Virginia.").

43.     Courts have dismissed bankruptcy cases as bad faith filings upon finding that the case was filed as a litigation tactic or as the result of forum shopping. *See, e.g., In re Argus Group 1700, Inc*., 206 B.R. 737, 753 (Bankr. E.D. Pa. 1996) (compiling cases).  These authorities make clear that "Congress did not create the bankruptcy courts to provide an alternative forum for unfavorable litigation." *Id*. at 756.  As a result, dismissal is appropriate where the evidence reflects that the debtor's primary motivation in seeking bankruptcy relief is to shop for a more favorable

forum for litigation. *See id*. at 753 (dismissing case upon finding that "Debtors filed this case for

an improper purpose, namely as a means to forum shop. [They] were dissatisfied with the treatment

they were receiving in the State Court and desired another forum in which to litigate their dispute.

Debtors commenced their bankruptcy cases to remove their dispute from the State Court to this

Court."); *see also In re Heritage Wood 'N Lakes Estates, Inc*., 73 B.R. 511, 514 (Bankr. M.D. Fla.

1987) (bankruptcy case dismissed where debtor "determined that it was not going to get the best

side of the coin in the state court and looked to go elsewhere to have a new bite at the apple.").

44.    As in *Argus*, the Debtor's motivation in filing this case can be "inferred from the

timing of [its] bankruptcy vis-à-vis the status and progress of" the litigation against the Debtor

and Martorello. 206 B.R. at 753-54. The Debtor's conduct reflects "blatant forum shopping" and

a bad faith effort to "revers[e] setbacks . . . suffered in another forum." *In re Monsour Med.*

*Center, Inc*., 154 B.R. 201, 209 (Bankr. W.D. Pa. 1993). "Such conduct is inappropriate and must

not be permitted." *Id*. Accordingly, this factor heavily favors dismissal.

B.    The Debtors has minimal assets beyond payments from Eventide, no employees, no
operations, and no need to reorganize.

45.    Dismissal is also appropriate because the Debtor's only meaningful asset is

payments from Eventide; it has no business operations, no employees, and therefore no need to

reorganize. The fact that the "debtor has one asset" is a factor courts frequently consider in

determining whether to dismiss under Section 1112(b). *Little Creek Dev. Co.*, 779 F.2d at 1072-

1073; *see also In re Sterling Bluff Inv'rs, LLC*, 515 B.R. 902, 916 (Bankr. S.D. Ga. 2014) (finding

this factor weighed against proceeding with the bankruptcy action where the "Debtor's assets

comprise a single investment"); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 299

(Bankr. D. Del. 2011) (finding this factor weighed against a debtor where it had "only one asset,"

*i.e.*, a "membership interest" in another company); *In re State St. Houses, Inc.*, 305 B.R. 726, 728

(Bankr. S.D. Fla. 2002), aff'd, 305 B.R. 738 (S.D. Fla. 2003) (finding this factor weighed against

a debtor where its only asset was a high-rise residential apartment building), *aff'd*, 356 F.3d 1345

(11th Cir. 2004); *In re PM Cross, LLC*, 494 B.R. 607, 611 (Bankr. D.N.H. 2013) (same).

46.    Here, although the Debtor has listed a few assets, the only asset of any significance

is the payments from Eventide, the vehicle through which Martorello gets paid through its sham

reorganization of Martorello's tribal lending business. Other than receipt of payments from

Eventide, Debtor's assets consists of 15 pieces of artwork, $100,000 investment in a company,

proceeds of a loan from Bluetech to Eventide loan (Bluetech no longer exists), a small loan owed

to the Debtor, and less than $20,000 in cash.

47.    The Debtor's lack of business operations and employees also supports dismissal.

*See Little Creek Dev. Co*., 779 F.2d at 1072-1073; *see also In re Orange Park S. P'ship*, 79 B.R.

79, 81 (Bankr. M.D. Fla. 1987) (finding bad faith where the debtor "ha[d] no employees;

conduct[ed] no business, and it [was] a mere shell entity" for its principal); *Matter of Indian Rocks

Landscaping of Indian Rocks Beach, Inc*., 77 B.R. 909, 911 (Bankr. M.D. Fla. 1987) (finding bad

faith where the debtor "was no longer operating any business, had no employees, no unsecured

debts, and no assets, filed its Chapter 11 Petition merely to gain the protection of the automatic

stay imposed by 11 U.S.C. § 362 and to litigate a money damage claim in the bankruptcy court");

*In re Canbec Inv. Corp.*, 349 B.R. 915, 918 (Bankr. M.D. Fla. 2006) (finding bad faith, in part,

because the debtor had "no employees").

48.    Like the cases cited above, the Debtor has no employees; in the Debtor's own

words, it is simply "a passive holding company established for the purpose of holding investments

of [Bluetech]. . .  It does not engage in business and has always served as a holding company,

and nothing more." Ex. 12 at 6.

49.     Because the Debtor has only one meaningful asset (payments from Eventide), no operations, and no employees, it also has no need to reorganize.  This factor therefore also supports dismissal.  *See, e.g.*, *Serfass*, 325 B.R. at 905-06 (finding bad faith where "there is no need for reorganization and the filing was for the sole purpose to use the judicial resources of the bankruptcy court, most likely under the assumption that the debtor will receive a more favorable treatment in the bankruptcy court then it had received so far in the state court").

C.   This case is essentially a two-party dispute, which can be more efficiently resolved in the ongoing litigation.

50.     The Debtor's Schedules make clear that this case is essentially a dispute between the Debtor and a group of consumer borrowers that assert class action claims against the Debtor as a joint tortfeasor in an illegal lending scheme.  Other than those consumer borrowers, the Debtor lists only two other creditors, both of which are law firms, one of which served as counsel for the Debtor in litigation against the Consumer Borrowers.

51.     Further, there is no evidence of "any pressure from" these law firms necessitating the filing of the petition. *See In re Brazos Emergency Physicians Ass'n, P.A.*, 471 F. App'x 393, 394 (5th Cir. 2012) (affirming the dismissal of a Chapter 11 petition where the debtor's "creditors were mainly insiders and affiliates, and as the bankruptcy petition was filed without any pressure from those creditors" and, thus, concluding that the "filing was to gain control of the state-court claims").

52.     Once placed in its proper context, this case is "essentially a two-party dispute" between the Consumer Borrowers and the Debtor. *In re Sydnor*, 431 B.R. 584, 592 (Bankr. D. Md. 2010).  Aside from the Debtor's self-serving and suspicious non-payment of legal fees, there "no other significant creditors" beyond the Consumer Borrowers, who can resolve their claims with the debtors in the ongoing class litigation in Virginia. *Id*.; *see also In re State St. Houses*, 305

B.R. at 736 ("the fact that Debtor faces no imminent threat from any of its other purported

creditors, is compelling evidence that this Chapter 11 filing is a mere two-party dispute[.] "), *aff'd*,

356 F.3d 1345 (11th Cir. 2004); *In re Midway Invest., Ltd.*, 187 B.R. 382, 389 (Bankr. S.D. Fla.

1995) (describing the case as "plainly a two party dispute" where the debtor "faced no imminent

threats from other creditors" and its "only pending disputes involve claims" brought against it

by "two tenants"). This factor also supports a finding of bad faith and dismissal under Section

1112(b).

     D.  The Debtor lacks the ability to reorganize.

     53.    In determining whether to dismiss a bad faith filing under Section 1112(b), courts

also consider whether the debtor has the ability to reorganize. *Serfass*, 325 B.R. at 905-06. Here,

it is far from clear how the Debtor intends to confirm a plan in this case—or even what a plan

might look like. As set forth above, the Debtor has no operations around which it can reorganize,

and its only meaningful source of revenue is payments from Eventide. Further, it appears that the

only creditors are the Consumer Borrowers (and the putative classes they seek to represent) and

the law firms representing the Debtor. Thus, it appears that the Debtors do not have an impaired

accepting class necessary to confirm a plan. 11 U.S.C. § 1129(a)(10). Dismissal is appropriate

where a debtor cannot prove an ability to reorganize based on the lack of an impaired accepting

class. *In re Babayoff*, 445 B.R. 64, 76–77 (Bankr. E.D.N.Y. 2011).

     54.    Furthermore, it is less than clear whether the Debtor has the funds necessary to pay

its Chapter 11 administrative expenses as they come due (which consist primarily, if not

exclusively of professional fees and expenses and US Trustee fees). The Debtor's Schedules

shows it has less than $20,000 in cash. Additionally, as discussed in more detail below, the

Debtor's stated plans to reorganize are doomed to fail due to the Court's inability to adjudicate

third party claims or grant third party releases. Because the Debtor lacks the ability to reorganize,

this factor warrants dismissal.

## II.     Alternatively, the Court Should Dismiss or Abstain Under Section 3005(a)

55.     If the Court declines to dismiss the Debtor's bankruptcy case for cause under Section 1112(b), it should exercise its discretion to suspend proceedings under Section 305(a)(1) pending the liquidation of the Consumer Borrowers' claims in one or more of the pending lawsuits. Suspending proceedings would permit the parties to liquidate claims against the Debtor's estate. Given the discovery that has taken place and the rulings on summary judgment in the *Williams* matter, the Consumer Borrowers believe that the claims against the Debtor can be resolved on summary judgment and that the amount of damages sought be stipulated. Once those claims are liquidated, the parties can return to this Court for further proceedings.

56.     Under Section 305(a)(1), the Court may dismiss a case or suspend proceedings if it finds that the interest of creditors and the debtor would be "better served" by a dismissal or suspension. *In re Acis Cap. Mgmt., L.P.*, 584 B.R. 115, 145 (Bankr. N.D. Tex. 2018).  Courts have identified a variety of factors to be considered when determining a request for abstention under Section 305(a)(1), including:

(1)     the economy and efficiency of administration;

(2)     whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court;

(3)     whether federal proceedings are necessary to reach a just and equitable solution;

(4)     whether there is an alternative means of achieving an equitable distribution of assets;

(5)     whether the debtor and the creditors are able to work out a less expensive out-

22

of- court arrangement which better serves all interests in the case;

(6)    whether a non-federal insolvency has proceeded so far in those proceedings
that it would be costly and time consuming to start afresh with the federal
bankruptcy process; and

(7)    the purpose for which bankruptcy jurisdiction has been sought.

*Id*. at 145 and n.118 (collecting cases).  However, the Court has substantial discretion in deciding
whether to abstain under Section 305(a)(1) and is not required to give each factor equal weight or
conduct a strict balancing.  *Id*. at 146; *In re Northshore Mainland Servs., Inc*., 537 B.R. 192, 203
(Bankr. D. Del. 2015).

57.    Considering the totality of the circumstances, *Northshore* 537 B.R. at 203, multiple
factors support abstention in this case.  The overarching justification for abstention is the Debtor's
the lack of good faith and the absence of a proper bankruptcy purpose in filing this case.  As
discussed above, the Debtor initiated this case for the sole purpose of gaining a tactical advantage
in pending litigation.  Under these circumstances, courts have exercised their discretion to abstain.
*In re Schur Mgmt. Co., Ltd*., 323 B.R. 123, 129 (Bankr. S.D.N.Y. 2005); *In re ABQ-MCB Joint
Venture*, 153 B.R. 338, 341 (Bankr. D. N.M. 1993).  Accordingly, factor seven strongly favors
abstention in this case.

58.    For similar reasons, factors two through five also favor abstention.  These factors all
turn upon the availability of an alternative forum to achieve an equitable distribution to creditors.
*Acis*, 584 B.R. at 146.  Here, there is pending class action litigation against the Debtor and
equitably distributing recoveries from the Debtor to class members under the supervision of a
federal district court.  As a result, there is an alternative forum—in which proceedings are already
under way—that is capable of achieving an equitable result for creditors.  Under these

circumstances, abstention is appropriate. *Id*.

59.     Finally, considerations of economy and efficiency of administration favor abstention under Section 305(a)(1).  Where there is no valid bankruptcy purpose being served in a case, especially where a case was filed as an improper litigation tactic, courts have concluded that creditors and debtors should not bear the expense of a bankruptcy.  *Acis*, 584 B.R. at 146 (abstention appropriate where bankruptcy "would simply add an additional layer of expense to the resolution of a two-party dispute and another forum already provides a suitable place to resolve the dispute"); *Argus*, 206 B.R. at 756 (noting debtors "would incur needless additional expenses if their bankruptcy case proceed[ed]," including fees of "specialized bankruptcy counsel," US trustee fees, and the costs of a plan and disclosure statement); *In re Realty Trust Corp*., 143 B.R. 920, 929 (D. N. Mariana Islands 1992) (extreme expense of administering case in bankruptcy because of additional legal fees that would be involved in hiring specialized bankruptcy counsel is a factor counseling dismissal of the case pursuant to § 305(a)); *In re Walter*, 108 B.R. 244, 251 (Bankr. C.D. Cal. 1989) (reasoning that debtor did not need a "staff of bankruptcy lawyers (and the high cost associated with retaining specialty counsel)"); *In re Bus. Info. Co., Inc.*, 81 B.R. 382, 387 (Bankr. W.D. Pa. 1988) (noting that bankruptcy petition already cost the Debtor $10,000 in legal fees and that substantially larger fees would be requested if the bankruptcy remained).  Neither creditors nor the Debtor should bear the expense of a Chapter 11 bankruptcy in this case at least until the claims against the Debtor are liquidated.  Factor 1 therefore supports abstention as well.

## **CONCLUSION & PRAYER**

60.     For the reasons set forth above, the Consumer Borrowers request entry of an order (i) dismissing this case for cause under 11 U.S.C. § 1112(b), (ii) alternatively, suspending all

proceedings in this matter under 11 U.S.C. § 305(a)(1), and (iii) awarding the Consumer Borrowers

any additional relief the Court deems appropriate.

Dated:  January 19, 2024

By:   */s/ Michael A. Caddell*
Kristi C. Kelly, *pro hac vice*
Andrew J. Guzzo, *pro hac vice*
**KELLY GUZZO, PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com

Michael A. Caddell
State Bar No. 03576700
**CADDELL & CHAPMAN**
628 East 9th Street
Houston, Texas 77007
Telephone: (713) 751-0400
Facsimile: (713) 751-0906
Email: mac@caddellchapman.com

*Attorneys for Creditors,*
*Virginia Class Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 19, 2024, a true and correct copy of the foregoing document was served upon all parties that are registered to receive electronic service through the court's CM/ECF notice system in the above case.


 /s/ Michael A. Caddell
Michael A. Caddell